**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DENTSPLY SIRONA, INC. SECURITIES LITIGATION, | No. 24 Civ. 9083 (NRB) <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN**
<u>**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   PLAINTIFFS' COMPLAINT ............................................................................ 5

    A.    Byte's Critical Importance to Dentsply's Growth Strategy ................................... 5

    B.    Defendants Falsely Portray Byte as a Safe, "Doctor-Directed" Treatment to Distinguish It From Competitors .......................................................... 6

    C.    Defendants Point to Byte's Sales as a "Bright Spot" at Dentsply Following the Revelation of a Separate Channel-Stuffing Scandal ........................................ 8

    D.    In Reality, Dentsply Drove Byte's Growth by Selling a Dangerous Product to Contraindicated Patients Without Any Meaningful Doctor Oversight ............. 10

        1.    The "Nationwide Network of Licensed Dentists" Was an Illusion Designed to Deceive Patients and Investors ............................................. 11

        2.    Dentsply Management Explicitly Directed the Sales Force to Target and Sell to Contraindicated Patients ............................................. 12

    E.    Defendants Knowingly Concealed and Lied About the Thousands of Serious Injuries Caused by Their Fraudulent Sales Practices .............................. 13

        1.    Dentsply Systematically Violated Its FDA Reporting Obligations and Its Own Internal Policies ................................................................. 13

        2.    Defendants Concealed Injuries to Thwart Legislative Scrutiny and Lied to Regulators ..................................................................................... 15

        3.    As Media Scrutiny Intensified, Dentsply Doubled Down With Public Lies ........................................................................................... 16

        4.    Dentsply Used Non-Disclosure Agreements to Silence Injured Patients ............................................................................................... 17

    F.    The Truth Emerges in a Series of Corrective Disclosures, Causing Massive Investor Losses ..................................................................................... 17

III.  THE COMPLAINT ADEQUATELY ALLEGES FALSITY ............................ 19

    A.    Defendants Made Materially False and Misleading Statements ......................... 20

        1.    Undisputed Misstatements .................................................................... 20

        2.    False Statements Regarding Ongoing Oversight by Licensed Dentists and Orthodontists ................................................................... 21

3.    False Statements Regarding Byte's Customer Standards and Screening for Contraindications ................................................. 23

4.    False Statements Concerning Byte's Conversion Rates and Financial Performance .................................................................. 25

5.    False Statements Regarding Compliance With FDA Reporting Regulations ..................................................................................... 25

6.    False Statements About Dentsply's Continued Investment in Byte ......... 26

B.    Defendants' Falsity Arguments Are Meritless ....................................................... 27

1.    Plaintiffs Adequately Plead the Doctor-Directed Statements Were False and Misleading .................................................................. 27

2.    Defendants' Statements Were Not "Puffery," "Opinions," Or Forward-Looking ...................................................................... 30

3.    Defendant Casey's Separate Falsity Arguments Also Fail ....................... 39

4.    All of the Challenged Statements Are Attributable to the Company ........ 41

IV.  THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER ...................... 42

A.    The Pleading Standard under the PSLRA ................................................................. 42

B.    The Complaint Adequately Alleges Scienter ........................................................... 43

1.    The Complaint Alleges the Executive Defendants' Scienter .................... 43

2.    The Complaint Alleges Dentsply's Corporate Scienter Based on Other Identified Officers Whose Scienter Should Be Imputed ................ 57

C.    Defendants' Scienter Arguments Are Meritless ..................................................... 59

V.  THE COMPLAINT ALLEGES A SCHEME CLAIM ......................................................... 76

VI.  THE COMPLAINT SUFFICIENTLY ALLEGES CONTROL CLAIMS UNDER SECTION 20(A) ....................................................................................................................... 80

VII.  CONCLUSION ........................................................................................................................ 82

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008)............................................................5, 77, 78, 80

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020).................................................................................34, 35, 55

*In re Acadia Pharms. Inc. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020)..........................................................32

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)...........................................................61, 66

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021).....................................................32, 33, 81, 82

*Africa v. Jianpu Technology Inc.*,
  2023 WL 5432282 (S.D.N.Y. Aug. 23, 2023).........................................................71

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005).....................................................................46, 52, 61

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ..................................................................................20

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010)............................................................... *passim*

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020)........................................................52

*In re AppHarvest Sec. Litig.*,
  684 F. Supp. 3d 201 (S.D.N.Y. 2023).....................................................................65

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................61

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...............................................................................................41

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).....................................................................73

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013)...................................................................................42

iii

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)........................................................................24, 32, 58, 72

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015).................................................................................26, 34

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005).............................................................................58, 71

*Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ........................................................................73

*Boston Ret. Sys. v. Alexion Pharms.*,
556 F. Supp. 3d 100 (D. Conn. 2021).........................................................................23, 25, 31

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)...................................................................................53

*In re Bristol Myers Squibb Co. Securities Litigation*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)...................................................................................81

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)...................................................................................66

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)...................................................................................53

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)..................................................................................................82

*In re Carter-Wallace Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998)..................................................................................................63

*In re Carter-Wallace Securities Litigation*,
220 F.3d 36 (2d Cir. 2000) (Casey MTD at 21) ....................................................................63

*CBS Broad. Inc. v. FilmOn.com, Inc.*,
2010 WL 4840091 (S.D.N.Y. Nov. 17, 2010).......................................................................32

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
403 F. Supp. 3d 712 (D. Minn. 2019)....................................................................................23

*Cheng Jiangchen v. Rentech, Inc.*,
2017 WL 10363990 (C.D. Cal. Nov. 20, 2017)......................................................................32

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..........................................................35, 36, 37

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
--- F.4th ---, 2025 WL 2457758 (2d Cir. Aug. 27, 2025) .......................................................30

*City of Brockton Ret. Sys. v. Shaw Grp. Inc.*,
540 F. Supp. 2d 464 (S.D.N.Y. 2008)..................................................................................61

*City of Brockton Retirement System v. Avon Products, Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)......................................................................31

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)................................................................................................33

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ....................................................................60

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ................................................................................................41

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)...........................................................................66, 81

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)....................................................................................51

*In re DiDi Glob. Inc. Sec. Litig.*,
2025 WL 1909295 (S.D.N.Y. July 7, 2025), *report and recommendation
adopted*, 2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025) .....................................................79

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................................63

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)..................................................................................30

*In re Dynex Cap., Inc. Sec. Litig.*,
2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ......................................................................61

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604
U.S. 20 (2024)......................................................................................................................60

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP 111Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...........................................................................................54, 69

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)..................................................................................33

v

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)......................................................................... *passim*

*In re EZCorp, Inc. Sec. Litig.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016).....................................................52, 60, 65

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 428 (S.D.N.Y. 2013).................................................................63

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017).................................................................................33, 34

*In re Firstenergy Corp.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022).......................................................53

*Foley v. Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012).................................................................68

*In re ForceField Energy Inc. Sec. Litig.*,
    2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) .................................................. *passim*

*Franchi v. SmileDirectClub, Inc.*,
    633 F. Supp. 3d 1046 (M.D. Tenn. 2022).....................................................2, 22, 28

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y.).................................................................54, 57, 75

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................19

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) .............................................................79, 80

*Garber v. Legg Mason, Inc.*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008).................................................................61

*Genesee Cnty. Emps.' Ret. Sys. v. DocGo Inc.*,
    773 F. Supp. 3d 62 (S.D.N.Y. 2025).................................................................51

*In re Global Crossing, Ltd. Sec. Litig.*,
    2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005).......................................................82

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)................35

*In re Grupo Televisa Sec. Litig.*,
    368 F. Supp. 3d 711 (S.D.N.Y. 2019).................................................................59

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ...............................................................................71

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)................................................................62

*Hou Liu v. Intercept Pharmaceuticals, Inc.*,
    2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020).....................................................64

*Hunt v. All. N. Am. Gov't Income Tr., Inc.*,
    159 F.3d 723 (2d Cir. 1998)................................................................................38

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
    236 F. Supp. 3d 824 (S.D.N.Y. 2017)................................................................66

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ...........................................79, 80

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).................................................................................70

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..........................................................................57, 74

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) .............................................................53, 62

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017)...........................................................23, 24

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)................................................................................72

*Janus Cap. Grp. Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)........................................................................................41, 42

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................58

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...............................................................................69

*Klein v. Altria Grp. Inc.*,
    525 F. Supp. 3d 638 (E.D. Va. 2021) ................................................................78

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014)..................................................................82

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010)........................................................................65

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).....................................................................................57

*Lorenzo v. SEC*,
587 U.S. 71 (2019)...................................................................................................76

*In re Lottery.com, Inc. Securities Litigation*,
765 F. Supp. 3d 303 (S.D.N.Y. 2025).................................................................31, 35

*Lozada v. TaskUs, Inc.*,
710 F. Supp. 3d 283 (S.D.N.Y. 2024)................................................................21, 65

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)...................................................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...............................................................................40, 49, 50, 63

*In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...............................................................42

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................63, 73

*In re Mylan N.V. Sec. Litig.*,
2025 WL 1874621 (W.D. Pa. July 8, 2025) ...........................................................78

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)......................................................................67

*N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*,
709 F.3d 109 (2d Cir. 2013)......................................................................................30

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
122 F.4th 28 (2d Cir. 2023) ................................................................................33, 34

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ...............................................................................56

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018), *aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020)........................54

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................19, 41, 61, 69

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .................................................................................41

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
2023 WL 6393865 (S.D.N.Y. Sept. 29, 2023).........................................................73

*Okla. Firefighters Pension & Ret. Sys. v. Musk*,
779 F. Supp. 3d 396 (S.D.N.Y. Mar. 28, 2025)......................................................77

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)......................................................................33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..................................................................................................36

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010).........................................................................................3

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)...................................................................54, 71

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................................58

*In re Parmalat Sec. Litig.*,
414 F. Supp. 2d 428 (S.D.N.Y. 2006)......................................................................80

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)......................................................................32

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016)......................................................................................42

*Pirnik v. Fiat Chrysler Autos., N.V.*,
2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ......................................................26, 31

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .......................................................................................78

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)..........................................................22

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................................66

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................61

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) .............................................69

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................33

*In re Salix Pharm, Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).........................................74

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024)............................................... *passim*

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...........................................................60, 66

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................................80

*SEC v. Farnsworth*,
    692 F. Supp. 3d 157 (S.D.N.Y. 2023)....................................................33

*SEC v. Rio Tinto*,
    41 F.4th 47 (2d Cir. 2022) ...........................................................76, 78

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)........................................................... *passim*

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020)......................................................... *passim*

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................19, 28, 49, 68

*Shetty v. Trivago N.V.*,
    796 F. App'x 31 (2d Cir. 2019) .........................................................61

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).........................................29

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    545 F. Supp. 3d 120 (S.D.N.Y. 2021)....................................................59

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020)....................................................69

*In re SLM Corp. Sec. Litig.*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010)....................................................................................65

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ...................................................................................27

*Stoneridge Investment Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008)................................................................................................................80

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021).....................................................................................................19

*In re Take-Two Interactive Securities Litigation*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................................70

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)...........................................................................61

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008).....................................................................................................61

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................................42, 59

*Thuman v. Dembski*,
2017 WL 3614522 (W.D.N.Y. Apr. 4, 2017) ..........................................................................70

*In re Tronox, Inc. Sec. Litig.*,
2010 WL 2835545 (S.D.N.Y. June 28, 2010) .........................................................................82

*Tung v. Bristol-Myers Squibb Co.*,
412 F. Supp. 3d 453 (S.D.N.Y. 2019)......................................................................................69

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022)......................................................................................62

*In re VEON Ltd. Sec. Litig.*,
2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).........................................................................25

*Villella v. Chem. & Mining Co. of Chile Inc.*,
2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .........................................................................31

*In re Virtu Fin., Inc. Sec. Litig.*,
770 F. Supp. 3d 482 (E.D.N.Y. 2025) .....................................................................................46

*In re Vivendi Universal S.A.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................................55

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)................................................................19, 28, 37, 55

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    845 F.3d 384 (8th Cir. 2016) ......................................................................................78

*In re Wachovia Equity Securities Litigation*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)........................................................................66

*Wyche v. Advanced Drainage Sys., Inc.*,
    710 F. App'x 471 (2d Cir. 2017) ................................................................................69

*Yoshikawa v. Exxon Mobil Corp.*,
    2024 WL 3802997 (N.D. Tex. Aug. 12, 2024)............................................................79

## RULES AND STATUTES

17 C.F.R. § 240.10b-5................................................................................................76

17 C.F.R. § 240.12b-2................................................................................................80

21 C.F.R. § 820.3(n) ..................................................................................................47

15 U.S.C. § 78u-4(b)(1) .............................................................................................76

**TABLE OF ABBREVIATIONS**

| Short Form | Definition |
| --- | --- |
| ¶ or Complaint | Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 51) |
| Brackett | Defendant Erania Brackett (¶39) |
| Campion | Defendant Simon D. Campion (¶34) |
| Casey | Defendant Donald M. Casey, Jr. (¶31) |
| Casey Appendix A | Chart of Alleged Material Misstatement/Omission Attributed to Donald M. Casey, Jr. (ECF No. 77-1) |
| Casey MTD | Defendant Donald M. Casey Jr.'s Memorandum of Law in Support of His Motion to Dismiss Plaintiffs' Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 77) |
| Casey.Ex. | Exhibits attached to the Declaration of Meredith D. Karp (ECF No. 78) |
| Class Period | January 4, 2021 to February 26, 2025, inclusive |
| Coleman | Defendant Glenn G. Coleman (¶35) |
| D.Ex. | Exhibits attached to the Declaration of Roger A. Cooper in Support of Joint Motion to Dismiss the Amended Complaint (ECF No. 70, the "Cooper Declaration") |
| D.Ex.19 | Challenged Statements That Are Puffery, Opinion And/Or Forward-Looking, Exhibit 19 to the Cooper Declaration (ECF No. 70-19) |
| Defendants | Dentsply and Executive Defendants (¶40) |
| Dentsply or Company | Defendant Dentsply Sirona Inc. (¶30) |
| Executive Defendants | Defendants Casey, Gomez, Campion, Coleman, Frank, Gunsagar, and Brackett (¶40) |
| Frank | Defendant Andreas G. Frank (¶37) |
| Gomez | Defendant Jorge M. Gomez (¶32) |
| Gomez MTD | Memorandum of Law in Support of Defendant Jorge Gomez's Motion to Dismiss (ECF No. 74) |
| Gunsagar | Defendant Neeraj Gunsagar (¶38) |
| MAUDE | Manufacturer and User Facility Device Experience (¶¶319-20) |
| MTD | Defendants' Memorandum of Law in Support of Their Joint Motion to Dismiss the Amended Complaint (ECF No. 71) |

*All other capitalized terms not identified in the chart have the same meaning as ascribed in the Complaint.

Lead Plaintiffs respectfully submit this omnibus memorandum of law in opposition to Defendants' motions to dismiss.[1]

## I.    <u>INTRODUCTION</u>

This case arises out of a series of misrepresentations and a fraudulent scheme by Defendants to sell Dentsply's most important and fastest growing medical device to patients who should never have received it, which predictably led to thousands of injuries which Defendants tracked but deliberately failed to report to the FDA. Facing enormous headwinds in its traditional business triggered by the onset of the COVID pandemic, Dentsply acquired Byte, a dental aligner company sold directly to patients over the internet. To distinguish it from other direct-to-consumer brands that had come under scrutiny, Dentsply assured investors that Byte was different—that it was a safe, "doctor-directed" treatment that was "prescribed and overseen" "every step of the way" by licensed dentists. Defendants also represented that Dentsply was highly selective in ensuring only those suitable for Byte treatment bought the product, that the Company adhered to all FDA regulations, and that Dentsply specifically "complied" with its FDA reporting obligations. To investors, Byte appeared to be a massive success. After a separate accounting scandal was revealed during the Class Period, Defendants pointed to Byte as a remaining "bright spot" and explained sales had skyrocketed due to "improved conversion" rates—with Byte ultimately becoming the only Dentsply product called out by name in its plan to achieve $3.00 earnings-per-share.

Unfortunately for investors, these statements were false. In reality, Dentsply limited the role of dentists to a single and uninformed prescription followed by no oversight; secretly sold Byte to patients who were medically unsuitable, or "contraindicated," for the product; and concealed from investors and the FDA thousands of devastating patient injuries including lost

---

[1] Unless noted, all emphasis is added and internal citations and quotations are omitted.

teeth, nerve damage, and oral abscesses. As the Complaint alleges, Dentsply's senior management directed and enforced the policy preventing dentist oversight, approved the intentional targeting of contraindicated patients, and had direct access to unreported patient injuries (at least 6,894 and counting) through the Company's TrackWise database and were regularly updated on injuries by the Company's quality executives—and deliberately and unlawfully failed to disclose any of this to the FDA.

This deception was critical to Dentsply's strategy to profit from Byte. Injuries disclosed to the FDA would be made public on the FDA's MAUDE database, exposing the truth about Byte's safety profile, hastening regulatory scrutiny and the legislative changes that Dentsply had been actively lobbying against, and revealing Defendants' public statements to be false. When Dentsply was eventually forced to begin back-reporting Byte injuries to the FDA, that is exactly what happened: the FDA intervened, Dentsply was forced to shut down the Byte business entirely, and the Company's stock price collapsed, erasing billions of dollars in shareholder value. These detailed allegations, corroborated by Defendants' own admissions, internal documents, and detailed accounts from numerous well-placed former employees, state a compelling claim for relief under the Private Securities Litigation Reform Act ("PSLRA"). *See, e.g.*, *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1073-74 (M.D. Tenn. 2022).

In moving to dismiss, Defendants make a series of arguments that ignore or mischaracterize the Complaint and should be rejected. To start, speaking volumes, Defendants do not challenge falsity for numerous of the alleged misstatements, and thus, for purposes of this motion, concede that they made numerous materially false and misleading statements to Dentsply investors. Specifically, Defendants concede they made over a dozen actionable misstatements, including those on Dentsply's website that it would not sell Byte if the customer was not a "good candidate"

(¶¶297-98); statements concerning Byte's improved "customer acquisition" process and "conversion" rate (¶¶306, 309, 311-12); statements that Dentsply made to an investigative journalist and analysts to downplay the seriousness of Dentsply's increasing reporting of injuries (¶¶328, 332-33, 337); and statements that Dentsply complied with the FDA's injury reporting rules (¶¶342-44).

For the statements whose falsity Defendants do contest, their arguments fail badly. For example, Defendants contend that their statements that Byte was "doctor-directed" and that some statements about improved "conversion rates" were technically true. But that is not the test under the securities laws, as the veracity of a statement is "measured not by its literal truth, but by its ability to accurately inform rather than mislead." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

Here, Byte treatment was not "doctor-directed." Dentists were not "involved every step of the way" but provided a mere "rubber stamp" while unqualified and unlicensed customer service staff dispensed dangerous medical advice to patients, who the Company actively prevented from speaking to any dentist. Further, while Dentsply claimed to "only accept patients who are great candidates," in truth, Dentsply never had an effective process to screen out contraindicated patients, and in August 2022, senior management secretly directed their sales force to deliberately sell to contraindicated patients—a strategy that immediately boosted sales and enabled Defendants Campion, Coleman, and Frank to tout impressive growth in Byte's "conversion rates." And contrary to Defendants' representations that the Company in fact "complied" with the regulations governing FDA reporting, Dentsply failed to report thousands of patient injuries that were closely tracked by senior management and required by Dentsply's own internal policies to be reported to the FDA. Dentsply also tries to rewrite several of its Class Period statements concerning Byte's

3

safety and supposed doctor oversight to argue they were somehow inactionable puffery, opinions, or forward-looking—but Defendants' statements here were about the most critical aspects of the Company's business, were verifiably false, and concerned Dentsply's current and historical practices.

Next, Defendants argue that the Complaint fails to allege the required strong inference of scienter, suggesting this was all an unfortunate business failure, not fraud. But this ignores the mountain of facts alleged. The Complaint alleges a compelling inference of scienter, detailing how senior management, including the Executive Defendants, orchestrated, knew about, and were motivated to commit the fraud by (1) directing the sales force to sell to contraindicated patients to boost the conversion rates they then touted to investors; (2) monitoring in real-time the thousands of resulting patient injuries through the Company's own TrackWise quality management system (and receiving regular reports of the same from quality executives) and choosing not to report them to the FDA; and (3) concealing the truth to prop up Dentsply's stock as the Company was reeling from pandemic headwinds and a prior channel-stuffing scandal, thwart state legislation that threatened to destroy the Byte business model, and reap millions of dollars in personal compensation dependent on Byte sales. Dentsply's own audit committee admitted that Defendants Casey and Gomez created an "inappropriate tone at the top," while the rest of the Executive Defendants exited the Company in a wave of suspicious departures as the FDA bore down and the scheme unraveled. Collectively, these facts give rise to a powerful inference of scienter.

Finally, ignoring the Complaint, Defendants argue Plaintiffs have failed to state a claim for scheme liability. That too is wrong. The Complaint alleges a course of deceptive conduct that goes far beyond mere misstatements. Defendants' deliberate failure to report thousands of serious patient injuries to the FDA—in direct violation of federal law and their own internal policies—

4

was designed to create a false picture of Byte's safety in the public MAUDE database, thereby deceiving investors, regulators, and legislators. Defendants also misled investors by requiring injured patients to sign NDAs and engaging in deceptive lobbying efforts that relied on the supposed "absence" of Byte injuries in the MAUDE database. Courts have held that this exact type of conduct—the failure to report adverse events to the FDA—is an actionable deceptive act giving rise to scheme liability, and the same is true here. *See In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *20-21 (D.N.J. Mar. 24, 2008). As set forth below, the motions should be denied.

## II.  PLAINTIFFS' COMPLAINT

### A.  Byte's Critical Importance to Dentsply's Growth Strategy

This case arises out of Defendants' misrepresentations about Byte, the Company's then most important and fastest-growing product line. The Class Period begins on January 4, 2021, when Dentsply, the world's largest manufacturer of professional dental products, announced the acquisition of Byte for $1.04 billion in an all-cash deal. ¶¶41, 55. Byte was Dentsply's largest acquisition in years, had a price tag of nearly 10% of the Company's market capitalization and 80% of its cash on hand, and the acquisition was personally overseen by Defendants Casey and Gomez (on Dentsply's side) and Defendant Gunsagar (on Byte's side). ¶55.

The Byte acquisition came at a crucial time for Dentsply, as the Company's traditional business, selling products to brick-and-mortar dental offices through distributors, was under unprecedented stress from the COVID-19 pandemic, which drastically reduced in-person dental visits and the demand for Dentsply's traditional products. ¶53. Byte, in stark contrast, was built on a direct-to-consumer ("DTC") sales model that marketed clear aligners directly to customers online, and thus did not require in-person office visits. ¶50. In 2020, the year before the acquisition, Byte sales surged 1,000%, spurred by COVID and Byte's public relations campaign focused on

building "consumer trust" by being "honest with their consumers," including with regard to "whether or not a consumer was a good candidate for the Byte system." ¶54.

Against this backdrop, Defendants presented Byte as a key solution to the Company's challenges and a primary engine for future growth. On the day the acquisition was announced, Defendants Casey, Gomez, and Gunsagar highlighted Byte's expected contribution in 2021 of $200 million in sales and an additional $0.05 to its earnings-per-share. ¶56. Throughout 2021, as other business lines continued to struggle, Casey and Gomez pointed to Byte as a "terrific addition" with a "very bright future" that was performing "above expectations." ¶¶67, 69.

### B. Defendants Falsely Portray Byte as a Safe, "Doctor-Directed" Treatment to Distinguish It From Competitors

From the outset, Defendants knew that to successfully market Byte to investors, they had to distinguish it from other DTC aligner brands, including the market leader, SmileDirectClub, which was facing intense scrutiny from patients, legislators, and the media for its questionable business practices and risks to patients. ¶¶56-60. Leveraging Dentsply's century-old reputation as a manufacturer of professional dental products, Defendants crafted a public narrative that positioned Byte as a safe alternative that combined the convenience of DTC sales with the safety and dentist oversight of traditional, in-office orthodontic care. ¶¶59-62.

Dentsply represented that Byte was a "doctor-directed" treatment, overseen "*every step of the way*" by a "nationwide network of licensed dentists and orthodontists [who] *prescribe and oversee* every customer's treatment plan." ¶¶57, 95. This message was central to the Byte value proposition and repeated by Defendants throughout the Class Period. For example, when asked on the January 4, 2021 investor call announcing the acquisition how Byte differed from SmileDirectClub, Defendant Casey's ready answer was that "Byte was built from the beginning around a direct-to-consumer business with a full network of licensed professionals involved."

6

¶¶6, 59. Defendant Gunsagar, Byte's CEO, echoed this, describing Byte as "doctor-directed care" that was "overseen by an extensive network of licensed dentists and orthodontists." ¶57.

Defendants' repeated statements that Byte was "doctor-directed" invoked an established meaning, referring to treatment under the ongoing supervision of a dentist, who regularly monitors progress and risk of injury and alters treatment as needed. ¶58. Defendants' statements placed Byte in the same category as professionally administered products like Invisalign and distanced it from other DTC products like SmileDirectClub. ¶59. This distinction was critical because of the scrutiny that SmileDirectClub was already facing at the start of the Class Period. ¶¶50-51. A widely-viewed February 2020 NBC News report, for example, excoriated SmileDirectClub for lacking "ongoing" supervision by a dentist and for patient injuries. ¶51. By touting Byte as "doctor-directed" (and concealing the Byte injuries tracked by Dentsply executives from the FDA) Defendants convinced investors that Byte was different from SmileDirectClub, which had its stock collapse and went bankrupt during the Class Period due to quality and safety issues. ¶¶51, 59, 61.

Defendants made additional misstatements to distinguish Byte from SmileDirectClub. ¶¶63-64. The Company's website and advertisements promised that "[l]icensed doctors and orthodontists [are] with [patients] every step of the way," would "check in with customers throughout their journey," and were available for consultation "7 days a week." ¶¶95, 261-273. On a webpage comparing Byte to SmileDirectClub, Dentsply claimed that while SmileDirectClub patients only checked in with a dentist "every 90 days," with Byte, "you can access your team at any time" and they would "assess every step of your smile improvement program." ¶63.

In addition, Defendants assured investors and patients Byte was safe because the Company was highly selective about customer standards. For example, they represented Dentsply would "only accept patients who are great candidates for teledentistry and clear aligners," defined as

7

patients with only "mild to moderate spacing and crowding issues." ¶¶14, 60. Patients with more complex cases or other contraindications, Defendants claimed, would be declined and refunded the cost of their initial impression kit. ¶¶93, 110. Defendants' statements about customer standards were critical because sales to contraindicated patients were dangerous and Dentsply's purported ability to target qualified patients was essential to the viability of Byte. ¶¶64, 110-29.

Defendant Casey further reassured investors, in response to an analyst question, that Dentsply's established corporate-level Quality Assurance and Regulatory Affairs "expertise" would allow Byte to "avoid the traps" that had ensnared SmileDirectClub. ¶61. Casey's statement was reinforced by Defendants' recurring statements that Dentsply complied with post-market surveillance and injury reporting—or Quality System Regulation ("QSR")—requirements (¶¶342-44) and was in "substantial compliance" with all FDA regulations, including specifically that Dentsply in fact "complied" with QSR regulations regarding reporting adverse events to the FDA, ¶¶91, 134, 316-25.

### C.    Defendants Point to Byte's Sales as a "Bright Spot" at Dentsply Following the Revelation of a Separate Channel-Stuffing Scandal

Byte's importance to Dentsply became even more acute in 2022, when a separate channel-stuffing scheme orchestrated by Defendants Casey and Gomez unraveled. In April and May 2022, Dentsply was forced to disclose that its Audit Committee was investigating improper accounting practices, that Casey had been terminated and Gomez had resigned, and that the Company would have to restate its financial results. ¶¶72-73. The Audit Committee ultimately concluded that Casey and Gomez had fostered an improper "tone at the top." ¶¶72-74, 78, 227.

With its traditional business model under investigation and its prior leaders disgraced, the new leadership team—Defendants Campion (CEO), Coleman (CFO), Frank (EVP, Product Group then EVP, CBO), and Brackett (SVP, Orthodontic Aligner Solutions & Customer Experience and

8

Head of Sustainability)—turned to Byte as one of the few remaining "bright spots" at the Company. ¶¶8, 80. Dentsply's traditional business relied on sales to dental offices through third-party distributors. ¶42. The prior leadership team had engaged in "channel-stuffing," a form of inventory fraud where they used incentives to cause distributors to buy more product than they could actually sell, artificially inflating Dentsply's sales. ¶43. As a business that sold directly to patients online, Byte sales were unaffected by the scandal and the intense scrutiny by investors and the audit committee on the Company's distributor relationships. ¶¶112-14, 212.

In fact, just as Defendants Campion and Coleman took over as CEO and CFO, respectively, in August and September 2022, Dentsply highlighted Byte as a strategic priority and almost immediately began to report increasingly impressive growth in Byte sales. For example, in their first Dentsply conference call, Defendants Campion and Coleman highlighted Byte as playing a "key role in our portfolio" and one of the remaining "bright spots in our U.S. business" and, in the very next quarter, reported increased sales based on improved "conversion rates." ¶¶81-89. Over the following quarters, Defendants Campion, Coleman, and Frank touted Byte's 20% annual growth rate and improved "conversion rates" on investor calls as evidence of Byte's success, which they falsely attributed to superior targeting of qualified customers and a "higher quality funnel." ¶¶87, 211, 219.

Unknown to investors, however, these increased sales were driven by Dentsply's secret management-led directive to intentionally increase Byte sales to contraindicated patients. Specifically, according to numerous former sales employees (including FE-5 and FE-6), Tyler Stoker, Byte's Head of Sales and Business Development, held a meeting in August 2022 during which he explicitly ordered the sales force to stop telling prospective patients that they were contraindicated for Byte treatment, made clear this was a company-wide policy approved by senior

9

leadership to improve sales figures, and that the sales force understood it as such. ¶113. The directive had its intended, immediate effect, with Byte's rejection rate plummeting from approximately 35% to less than 10-15% almost overnight—data that was tracked on a sales dashboard accessible to senior management (¶115)—and a corresponding 20% increase in Byte's "conversion rate," the metric Defendants Campion, Coleman, and Frank tracked and touted on investor call as evidence of Byte's success. ¶¶87, 211.

Instead of disclosing the true reasons behind Byte's dramatically improved "conversion rate," Defendants told investors that the sales growth was due to legitimate changes the Company had made to improve patient marketing and selection. For example, Defendant Coleman told investors the "higher customer conversion rates" had been achieved by "really looking at the quality of the funnel and how we're targeting customers," while Defendant Campion attributed the success to having "refine[d] our questioning on our surveys as they come into the funnel that we move potential customers to the side if we really don't think that they're going to end up purchasing," which he claimed had "meaningfully improved" Byte's conversion rate. ¶87.

### D.    In Reality, Dentsply Drove Byte's Growth by Selling a Dangerous Product to Contraindicated Patients Without Any Meaningful Doctor Oversight

Defendants' carefully crafted public image for Byte that it was a safe, "doctor-directed" treatment, "prescribed and overseen" "every step of the way" by licensed dentists and orthodontists who would only accept "great candidates" with "mild to moderate" issues, all while ensuring compliance with FDA regulations, bore no resemblance to reality. In truth, as evidenced in the accounts of former Dentsply employees, patients, and thousands of belatedly filed adverse event reports, Dentsply secretly drove revenues by selling Byte to contraindicated patients with no doctor oversight, causing thousands of serious injuries that it then systematically and illegally concealed from the FDA to avoid regulatory scrutiny.

### 1.    The "Nationwide Network of Licensed Dentists" Was an Illusion Designed to Deceive Patients and Investors

Defendants' repeated representation that Byte was a "doctor-directed" treatment overseen by a network of licensed professionals was a fiction. ¶¶11, 95. The Complaint details how dentists and orthodontists played virtually no meaningful role in Byte patient care.

*First*, while Defendants told investors that Byte's "nationwide network of licensed dentists and orthodontists ***prescribe and oversee*** every customer's treatment plan" (¶253), dentists would at most "prescribe" (based on incomplete and inadequate information hastily reviewed) but never "oversee." To start, Dentsply did not employ licensed U.S. dentists or orthodontists to create patient treatment plans; instead, that critical task was outsourced to unlicensed personnel in Costa Rica. ¶96. According to a former Treatment Planner (FE-1), who was himself a dental hygienist, 80% of his colleagues had no dental-related license at all and were pressured by senior management to make crucial medical decisions without the necessary training. ¶96. That pressure included requiring unlicensed staff to create treatment plans even when critical patient information was missing, forcing them to guess about the shape and positioning of a patient's teeth when designing the aligners. ¶96.

*Second*, the supposed review and approval by a U.S.-licensed dentist was a mere "rubber stamp." ¶95. According to a former Senior Software Engineer who designed the system (FE-2), after a patient had already arranged for payment, their treatment plan was sent to a dentist who could approve it with just four clicks, sometimes in less than two minutes, without even being required to scroll through the patient's materials. ¶98. Dentsply incentivized these cursory reviews by paying dentists on a "per case" basis, and assigning cases to dentists with the lowest per-case fees, leading to the rise of "super-approvers" who approved 85% to 95% of cases sent to them. ¶99. Worse, even when one or even two dentists rejected a patient's treatment plan as unsafe or

11

contraindicated, Dentsply's system would simply "auto-reassign" the case to another dentist until an approval was finally secured. ¶100.

***Third***, after this four-click approval, the dentist's involvement ended. The supposed "network" of doctors had no further role in the patient's treatment. ¶101. Dentsply actively prevented any communication between patients and the approving doctors, even when patients suffered serious injuries and begged to speak with a dentist. ¶¶12, 101, 104. All subsequent patient monitoring and clinical decisions were handled by Dentsply's customer support employees, who were not dentists and were grossly unqualified to handle the deluge of complaints. ¶¶102-07. These support staff, with no medical training, would "play" dentist, asking patients diagnostic questions and suggesting dangerous do-it-yourself remedies, such as having patients file down their aligners with household tools or "backtrack" to wearing older aligners, a practice that altered the treatment plan and significantly increased the risk of injury. ¶¶103, 107.

### 2.    Dentsply Management Explicitly Directed the Sales Force to Target and Sell to Contraindicated Patients

Defendants also told investors that Byte would "only accept patients who are great candidates for teledentistry and clear aligners" with only "mild to moderate spacing and crowding" issues. ¶¶14, 113. This was false. In truth, Dentsply never had an effective process to screen out unsuitable patients and, worse, ramped up its intentional targeting of contraindicated patients in August 2022 to boost sales. ¶111. Even before August 2022, Dentsply was designing treatment plans without the photos and medical history necessary to screen for contraindications and was "auto-reassign[ing]" cases rejected by dentists until the treatment was approved. ¶100.

This fraudulent practice dramatically accelerated in August 2022, the same month that Defendant Campion took over as CEO, and a few months after Defendant Frank took over as the EVP above the Byte business and assumed responsibility for improving the conversion rate. Senior

12

management's directive to sell Byte to contraindicated patients was delivered by Tyler Stoker, Byte's Head of Sales and Business Development. ¶113. As detailed in the Complaint and described by multiple former Byte employees, during this August 2022 meeting, Stoker explicitly ordered the sales force to stop telling prospective patients that they were contraindicated for Byte treatment, explained this was a company-wide mandate approved by senior leadership to improve sales figures (*id.*), and later told the sales force the directive had its intended, immediate effect in dramatically improving Byte's "conversion rate." ¶¶15, 87, 211. At a follow-up meeting, Stoker praised the sales team for the increased sales and lower rejection rate, telling them to "keep up the good work," and confirmed the policy was directly tied to Dentsply's need to "improve its numbers, to ensure bonuses would be paid, and to keep the new CEO happy." ¶116.

### E.    Defendants Knowingly Concealed and Lied About the Thousands of Serious Injuries Caused by Their Fraudulent Sales Practices

The inevitable consequence of selling an unsupervised orthodontic device to unsuitable patients was a tidal wave of serious and often irreversible injuries. ¶¶121, 149. However, in order to preserve Byte's touted contribution to Dentsply's otherwise struggling business, Dentsply covered them up, and lied about the injuries to the FDA, investors, and the public.

### 1.    Dentsply Systematically Violated Its FDA Reporting Obligations and Its Own Internal Policies

As a manufacturer of a Class II medical device, Dentsply was legally required to report any serious patient injury to the FDA within 30 days. ¶¶317-19. The FDA's Quality System Regulation also requires "management with executive responsibility" to establish and maintain quality systems to ensure compliance with that rule and others. ¶322.

Dentsply had a sophisticated software system for tracking patient injuries, called TrackWise, which was specifically designed to inform management of injuries and facilitate FDA reporting. ¶132. The Dentsply executives closest to the business unit (including Defendants

13

Gunsagar and Brackett) had direct access to this software and personally reviewed injuries. ¶¶131-33. Defendants Gunsagar and Casey publicly admitted that they personally reviewed Byte patient feedback daily. ¶219. As detailed by a high-ranking former quality executive (FE-7), Dentsply's senior executives, including the CEO (Defendants Casey and Campion), also received quarterly briefings on patient injuries from Dentsply's quality executives. ¶¶17, 132, 215. FE-7 also describes Dentsply's internal policy, known as the "Decision Tree," which explicitly defined any injury involving the loss of a tooth as a serious injury that was required to be reported to the FDA. ¶133. FE-8, a Byte Records Specialist, reported that management acknowledged Dentsply's underreporting of Byte injuries to the FDA at an internal meeting in 2023, and there was a second internal meeting in June 2024 where management warned Byte employees that the influx of injury reports could be capturing the FDA's attention, and instructed employees not to speak to anyone from the FDA without management present—a measure that acknowledges culpability and demonstrates management's efforts to conceal. ¶144.

Despite their legal obligations, access to the data, and own internal policies, Defendants systematically failed to report the vast majority of Byte injuries. By its own admission in retrospective reports, Dentsply failed to timely report at least *6,894* serious Byte injuries. ¶135. This includes failing to timely report at least *99%* of the injuries that occurred between January 2021 and August 2022, and at least 80% of the injuries that occurred between September 2022 and August 2024. ¶¶137, 150. The suppressed reports included hundreds of cases involving the complete loss of a tooth, a tooth fracture, or pulp necrosis (death of a tooth)—injuries that Dentsply's own policy acknowledged as mandatorily reportable. ¶¶139-41.

Indeed, this widespread failure was no secret within the Company, and was in fact internally acknowledged by management and discussed with the Byte sales force throughout the

14

Class Period, including during meetings in 2023 and 2024. ¶144. As reported by *The Capitol Forum*, Dentsply held a "big meeting in July [2024]" where senior management explicitly admitted to employees "we know our complaints aren't being filed correctly." ¶177. This was not a sudden realization, but followed senior management's prior instruction to sell Byte to contraindicated patients in 2022, its internal acknowledgment that injuries were not being reported to the FDA in 2023, and its instruction to the sales force to not disclose any of this to the FDA unless management was present in 2024 (¶144)—in other words, an acknowledgment that Dentsply was finally being forced to come clean as the FDA bore down.

### 2. Defendants Concealed Injuries to Thwart Legislative Scrutiny and Lied to Regulators

Defendants' decision to conceal at least 6,894 serious injuries was not a series of 6,894 inadvertent errors; it was a deliberate scheme to protect Byte's business and Dentsply's stock price from collapse. ¶152. Defendants knew that any reports submitted to the FDA would become publicly available online through the agency's MAUDE database. ¶¶161, 167. Indeed, once Dentsply belatedly began to report them to the FDA late in the Class Period, that's exactly what happened, with investigative journalists and analysts immediately questioning Dentsply's senior management. ¶¶173-74. Concealing Byte injuries was also critical because, during the Class Period, state legislatures and regulators were considering new laws and rules for DTC aligners that would have destroyed Byte. ¶¶19, 160-61. As Dentsply's executives were acutely aware, advocates for these new laws and rules were specifically citing injury data from MAUDE. ¶¶161, 167.

By illegally withholding thousands of injury reports, Dentsply created a deceptively clean safety record for Byte. The Company then leveraged this false safety record to lobby against new patient protections. For example, in an April 2022 letter to Illinois regulators, Byte argued there

was no "clinical or evidentiary support" to justify patient protections, all while concealing hundreds of unreported injuries. ¶¶152, 163.

In January 2024, facing a similar bill in the Florida Senate, Dentsply dispatched Dr. Angela McMullin to testify on its behalf. Dr. McMullin falsely assured the committee that if Byte patients "run into" "any issues," "the dentist is the one consulted on how to proceed" (¶¶165-66)—when in fact patients were routinely denied access to any doctor. ¶¶101-07. Dr. McMullin was no rogue spokesperson; her appearance was part of a coordinated "government relations" campaign touted by Defendants. ¶¶171, 217.

### 3. As Media Scrutiny Intensified, Dentsply Doubled Down With Public Lies

As scrutiny into Byte and its business model intensified, the Company responded with more falsehoods. In June 2024, after investigative journalists at *The Capitol Forum* reported an unusual uptick in the few MAUDE reports Dentsply had filed, the Company flatly denied any problem. ¶173. A Dentsply spokesperson issued a statement claiming the increase was "strictly related to our efforts to continuously improve our process" and falsely assured the public that "there have been no changes in the quality, safety, or effectiveness of our Byte products." ¶174. This statement was false and misleading. Just one month later, in a July 2024 emergency internal meeting, Dentsply senior management admitted to employees that "we know our complaints aren't being filed correctly." ¶¶176-77.

Then, in September 2024, the Company told *The Capitol Forum* that an additional increase in adverse event reports was due to "prudently enhancing our reportability criteria" and that Byte's complaint rates were "consistent with other on-market" aligners—another falsehood, as Byte's reported injury rate was multiples higher than its main competitor. ¶¶332-33, 336. Had Dentsply complied with the law, the flood of injury reports into the MAUDE database would have provided

exactly the evidence demonstrating the need to pass the new laws and would have simultaneously exposed the truth about Byte's safety to investors.

### 4.    Dentsply Used Non-Disclosure Agreements to Silence Injured Patients

In addition to concealing injuries from the FDA, Dentsply also took other active steps to silence patient victims through restrictive non-disclosure and non-disparagement agreements (NDAs). ¶153. These NDAs prohibited injured patients from making any public statements about their experience with Byte, thereby preventing the truth about its safety from reaching the public (¶154)—a practice used by SmileDirectClub later targeted by the D.C. Attorney General. ¶155.

### F.    The Truth Emerges in a Series of Corrective Disclosures, Causing Massive Investor Losses

Defendants' fraudulent scheme began to unravel in the fall of 2024, after media and regulatory scrutiny intensified as Dentsply belatedly began reporting Byte injuries to the FDA. ¶¶173-79. The truth was ultimately revealed to investors in a series of corrective disclosures between October 2024 and February 2025. ¶180.

*First*, on October 24, 2024, Dentsply announced it was "voluntarily" suspending all sales and marketing of Byte "in consultation with" the FDA. The next day, Defendant Campion admitted for the first time that Dentsply had been selling Byte to contraindicated patients and that the company was filing "retrospective"—i.e., untimely—reports of patient injuries. In response, Dentsply's stock fell 4.5%. ¶¶181, 183, 189.

*Second*, on November 7, 2024, Dentsply revealed the suspension was more serious than previously disclosed, announcing it had informed all relevant Byte employees that their jobs would be eliminated. The Company also took a $145 million goodwill impairment and lowered its financial guidance. The market reacted with shock, with analysts noting the shut-down appeared permanent, and Dentsply's stock price collapsed over 28%. ¶¶190-94.

17

***Third***, on January 14, 2025, Dentsply disclosed it would no longer be selling Byte as a DTC product, triggering another 3.5% stock price decline. ¶¶195, 197.

***Finally***, on February 27, 2025, Dentsply confirmed that the Byte business was being shut down entirely and that the Company would incur tens of millions of dollars in costs for customer refunds and plus other unquantified remediation efforts to address the widespread patient injuries its fraudulent practices had caused. Acknowledging that the business was now worthless, Dentsply took a final charge of $370 million for a "full write-off of the Byte trademark." The stock plunged again, falling nearly 9%. ¶¶198-99, 202.

In the wake of these disclosures, the fallout has been swift and severe. Every single Defendant and senior executive responsible for Byte has now departed the Company. Dentsply's former CEO and CFO Defendants Casey and Gomez were forced out following revelations of the distributor channel-stuffing. ¶¶229-30. Byte's CEO, Defendant Gunsagar, departed in August 2022, just after securing a $19.6 million payout tied to a Byte performance metric. ¶231. Then, as the FDA began closing in during 2024, Defendant CFO Coleman, and Defendants Frank and Brackett, the two Dentsply executives with the most direct responsibility for Byte, all departed in rapid succession—just before the Company began filing thousands of retrospective injury reports. ¶¶232-35. Dentsply is now the subject of consumer lawsuits by Byte patients, and the SEC has begun an investigation into Byte. ¶¶205-06.

Meanwhile, Dentsply has continued to belatedly file reports with the FDA, admitting to another 959 serious injuries in March and April 2025 alone, with over 160 of those reports stating the patient was "contraindicated." ¶¶22, 203-06. Since the Complaint was filed, Dentsply has continued to report hundreds of additional Byte injuries each month, and Defendant Campion, Dentsply's CEO who oversaw the alleged fraud, resigned in July 2025.

18

### III.    THE COMPLAINT ADEQUATELY ALLEGES FALSITY

Plaintiffs adequately allege Defendants' false and misleading statements. "[A]t the moment the company chooses to speak, it takes upon itself the obligation to speak truthfully, and it is the breach of that obligation which forms the basis for the § 10(b) claim." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphases omitted). Rule 10b–5(b) "requires disclosure of information necessary to ensure that statements already made are clear and complete," and therefore proscribes not only literally false statements but also misleading "half-truths," *i.e.*, "representations that state the truth only so far as it goes, while omitting critical qualifying information," such as "a child not telling his parents he ate a whole cake and telling them he had dessert." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264-65 (2024). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

Rule 9(b) and the PSLRA require the Complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). To do this, Plaintiffs need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015) (emphasis omitted). The "focus[]" of the particularity inquiry is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Even under this "heightened" pleading standard, the Court must "accept all factual allegations in the complaint as true," "consider the complaint in its entirety," "draw all reasonable inferences in favor of the plaintiff," and dismiss only if plaintiff "can prove no set of facts

19

consistent with the complaint that would entitle [it] to relief." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021).

The Court can consider Defendants' exhibits only "for the fact that the contents were disclosed," not "not for the truth of their contents." *In re ForceField Energy Inc. Sec. Litig.*, 2017 WL 1319802, at *1 (S.D.N.Y. Mar. 29, 2017) (Buchwald, J.).[2]

As explained below, the Complaint readily satisfies this standard as to the five categories of false and misleading statements that Defendants made.

### A.    Defendants Made Materially False and Misleading Statements

### 1.    Undisputed Misstatements

As an initial matter, Defendants have conceded for purposes of this motion that at least a dozen of their challenged statements were materially false and misleading. Specifically, Defendants have not moved to dismiss for lack of falsity:

- numerous statements on Dentsply's website for nearly all of the Class Period, to the effect Dentsply would refund the cost of impression kits if patients were not a "good candidate" for Byte, including specifically if the patient had a contraindication such as severe crowding or spacing, an irregular bite, dental implants, or missing teeth (¶¶297-98);

- Campion's May 3, 2023 statement that Byte's growth was due to an "improved" customer acquisition process that was "bringing into the funnel" better customers (¶306); Coleman's August 3, 2023 statement touting Byte's "improved customer conversion rates" (¶309); Frank's November 9, 2023 statement Byte's "20% higher customer conversion rates" were due to a new "marketing strategy to focus on specific target demographics" (¶311); and Campion's November 15, 2023

---

[2] For example, Defendants cite to a low-quality printout (with much of the text cut-off) from Byte's own website for their factual claim that Byte patients were "determined by licensed orthodontists in the prospective candidate's state to be suitable candidates for treatment." MTD at 6 (citing D.Ex. 18). The Complaint alleges the description on that very webpage was false and misleading (¶¶293, 298), and the Court clearly cannot accept Defendants' counterfactual argument based on this questionable document. Defendants' extensive citations to extrinsic exhibits, rather than the Complaint, confirms their motion presents fact disputes not appropriately resolved before discovery. *See, e.g.*, MTD at 4-9.

> statement that Byte's "conversion rates have gone up" due to a "smaller funnel" (¶312);
>
> •   statements that Dentsply made to an investigative journalist (*The Capitol Forum*) and an analyst (William Blair) in June and September 2024, including: that its increasing injury reports were "strictly related to our efforts to continuously improve our processes in alignment with current, global regulatory requirements"; that Dentsply complied with its FDA reporting obligations and that "all medical device reports are thoroughly investigated in accordance" with those obligations; and that Byte's complaint rates were "consistent with other on-market orthodontic aligner solution rates" (¶¶328, 332-33, 337); and
>
> •   statements in Dentsply's annual Sustainability Reports that it "comp[lied]" with the FDA's post-market surveillance and QSR rules (¶¶342-44)

Defendants have waived any falsity arguments as to these statements, and the Court need only address scienter to find the Complaint states a claim and should proceed to discovery. *See Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 307 (S.D.N.Y. 2024).

### 2. False Statements Regarding Ongoing Oversight by Licensed Dentists and Orthodontists

Defendants repeatedly made false and misleading statements regarding the purported ongoing oversight that dentists exercised in Byte treatment. For example, Defendants stated that "Byte's nationwide network of licensed dentists and orthodontists ***prescribe and oversee*** every customer's treatment plan," (¶253), that patients "have access to [their] care team ***7 days a week***," if they "need[ed] to ***consult the doctor***," (¶263), and described Byte as a form of "***doctor-directed*** care," (¶254), which included providing access to "Licensed doctors and orthodontists . . . ***every step of the way***." ¶269. Moreover, Dr. McMullin, speaking on behalf of Dentsply, stated that if a patient is approved for Byte treatment, "the patient ***stays with that same Florida licensed dentist***, . . . and if there are any issues they run into, the dentist is the one consulted on how to proceed." ¶287.

These statements were false because, in reality, there was no dentist oversight or direction of Byte treatment, which was instead overseen and directed by dangerously unqualified customer

21

support employees. ¶¶95-109. Far from providing access to licensed dentists "7 days a week" or "every step of the way," in truth, Dentsply's policies prevented patients from speaking to any dentist, even if the patient requested to do so or even complained of serious injury. ¶¶101, 104. Byte's unqualified customer support team was not even permitted to "consult" with any dentist—let alone the patient's prescribing dentist—when responded to patient inquiries. ¶¶102-03, 107-09.

Similar statements have been sustained as actionable. *SmileDirectClub* is directly on point. 633 F. Supp. 3d at 1073-74. In that case, SmileDirectClub's statements that it provided "excellent clinical care" and that "doctors in [its] network evaluate [its] members' progress throughout treatment, and are available to answer any questions should members need additional assistance" were sustained as misleading because "dentists had no meaningful contact with customers, their only involvement being a superficial review of a photo or impression of a customer's teeth" and if "customers had issues, they were directed to speak with hygienists rather than a licensed dentist." *Id*. Just like SmileDirectClub, Dentsply claimed that dentists had an ongoing role in patient treatment when, in reality, dentists were relegated to at most a one-time, initial approval or prescription (based on a cursory review of inadequate information). Indeed, Dentsply continued to misstate the role of dentists for years *after* a federal court held that SmileDirectClub's statements were actionable as securities fraud. Even though Dentsply falsely claimed that its "network" of dentists distinguished Byte from SmileDirectClub, if anything, SmileDirectClub had *more* dental oversight than Byte. ¶¶57-63, 65, 273, 327.

As in *SmileDirectClub*, courts have routinely sustained as actionable statements that misdescribe an important business practice. *See also, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*9 (S.D.N.Y. Apr. 14, 2020) (statements about business strategy to gain market share by "leverag[ing]" a "Performance Sports platform" actionable where

strategy was executed in part through "short-run sales tactics" that led to inventory buildup); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610-11 (S.D.N.Y. 2017) (statements about defendant's "independent agency status" that distinguished it from peers actionable).[3]

### 3. False Statements Regarding Byte's Customer Standards and Screening for Contraindications

Defendants also made false and misleading statements regarding their customer standards and screening of prospective patients for contraindications. For example, Defendants claimed that Dentsply "*only accept[s] customers who are great candidates for teledentistry and can safely use Byte for improving their smile*," that Dentsply does not "*compromise on safety*," ¶291, that "*Byte is basically Class I*," ¶299, that Dentsply "*thoroughly analyze[s] each customer's impressions and information to ensure a safe and effective treatment plan*," ¶295, that a patient's "*at-home impressions will give [Dentsply] the information [it] need[s] to know if [the patient is] a good candidate for Byte treatment*," and that if a patient's impressions revealed that they were not a good candidate for treatment with Byte, that Dentsply would "*refund the full price of the Impression Kit*." ¶297.

These statements were false and misleading because, as Dentsply has now admitted, it did not have an effective process for screening out contraindicated patients, but rather sold Byte to many contraindicated patients, which was dangerous and often resulted in serious injury. ¶¶118-29, 292. As described by FE-1, FE-2, and FE-3, throughout the Class Period, Dentsply did not follow its publicly represented procedures because it would plan treatments without the necessary photos or

---

[3] *Boston Ret. Sys. v. Alexion Pharms.*, 556 F. Supp. 3d 100, 115-16 (D. Conn. 2021) (statements attributing drugs sales to "positive impact of our disease awareness and diagnostic initiatives" actionable by not disclosing the "full picture" that they were also driven by unethical sales practices); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 725 (D. Minn. 2019) (statements touting sales strategies such as a focus on customer loyalty and service "bundling" actionable where results were driven by improper sales practices).

medical history, because approvals were given after rubber-stamp cursory reviews, and because even cases rejected due to contraindications were simply auto-reassigned to a new treatment planner or dentist until they were finally approved. ¶¶96-100. Courts sustain statements about sales and other business practices as false when they differ from reality, particularly when they are as concrete and definite as here. *See, e.g.*, *Inv. Tech. Grp.*, 251 F. Supp. 3d at 610-11 ("more definite statements about a company's business practices" actionable, particularly in case where they "distinguished it from competitors"). And there are a long line of cases in this District sustaining statements assuring a company's safety and compliance efforts that are more vague and attenuated from the company's actual practices than those here. *See, e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80-81 (S.D.N.Y. 2017) (Buchwald, J.) (finding purported "overriding commitment" to ensuring "the safety of our people" which "informs everything we do and influences every aspect of our work" actionable when defendant ignored safety risks and maintained a deficient emergency action plan); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 271 (S.D.N.Y. 2010) (Buchwald, J.) (statements characterizing company's underwriting standards as "rigorous" and "conservative" misleading for failing to disclose the "lowering of such standards").

Defendants continued to misrepresent customer standards after August 2022, ¶¶294, 296, 298, after Dentsply ramped up its target of contraindicated patients. That month, as described by FE-5 and FE-6, Dentsply management explicitly instructed sales representatives to cease informing patients of contraindications, defrauding patients into a significant increase in aligner sales (and avoiding a corresponding number of impression kit refunds). ¶¶112-16. It was even more misleading for Dentsply to tout its customer standard after deliberately lowering them. *Ambac*, 693 F. Supp. 2d at 271.

24

### 4. False Statements Concerning Byte's Conversion Rates and Financial Performance

After August 2022, Defendants also misleadingly touted Byte's increased customer "conversion rates," *i.e.*, the percentage of impression kit sales that led to aligner sales, and falsely attributed such increases to, for example, improved "*targeting*," ¶304, the Company's "*sales incentive program and the sales training programs*," ¶306, a "*higher quality [sales] funnel*," ¶307, "*refine[ment] [of] our questioning on our surveys*," ¶310, and a change in "*marketing strategy to focus on specific target demographics*." ¶311.

Contrary to Defendants' representations that Byte's increased customer conversion rates were driven by better targeting, a better sales funnel, or any benign explanation, the conversion rate improvements were driven by senior management's directive to sell Byte to more contraindicated patients. ¶¶115-16, 211. Statements like these, "which speak specifically about the source of a company's financial or other success are misleading when they fail to disclose illegal or unethical conduct that is a source of that success." *Alexion Pharms.*, 556 F. Supp. 3d at 121 (sustaining statements about source of revenue growth when results were in fact driven by high-pressure sales tactics); *see also In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *5-7 (S.D.N.Y. Sept. 19, 2017) (statements attributing financial results to "sales and marketing efforts" actionable when the true source of growing revenue was an illegitimate bribery scheme).

### 5. False Statements Regarding Compliance With FDA Reporting Regulations

Defendants made several false and misleading statements regarding their compliance with FDA reporting regulations. For example, Defendants stated that "*all medical device reports are thoroughly investigated in accordance with 21 CFR 820*," ¶328, that Dentsply had a "*Product Safety Program*" that includes, among other things, "*A Post-Market Surveillance Process, per product group, to ensure compliance with applicable PMS requirements*," ¶¶342-43, that

25

Dentsply "*compl[ies] with FDA QSR 820*," ¶344), and that "*[t]he Company believes it is in substantial compliance with the laws and regulations that regulate its business*," including specifically FDA medical-device regulations regarding "*notification*." ¶349.

These statements were false and misleading because Dentsply was systematically ***not*** complying with the FDA's Quality System Regulation rule (21 C.F.R. Part 820), an applicable post-market surveillance requirement, and instead concealing from the FDA at least ***6,894*** serious patient injuries per Dentsply's own retrospective reports (which have continued to increase since the Complaint was filed). ¶¶130-52, 316-25. Courts in this district hold statements regarding legal compliance are actionable when the maker of the statement is in significant non-compliance. *See, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 728-32 (S.D.N.Y. 2015) (statement that company "believes it is in substantial compliance with all laws, rules and regulations that affects its business and operations" actionable when defendants were on notice of noncompliance); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5-6 (S.D.N.Y. Oct. 5, 2016) (statement that company was "substantially in compliance with the relevant global regulatory requirements," when, "only months later," the company "admitted to widespread noncompliance with those requirements").

### 6.    False Statements About Dentsply's Continued Investment in Byte

Last, Campion and Coleman made several false and misleading statements in early 2024 regarding Dentsply's continued investment in Byte, for example Coleman stating "[w]e have invested behind the growth that we're seeing, *increasing the number of treatment planners*." ¶¶355-57.

These statements were false and misleading because, in reality, rather than hiring more treatment planners, Dentsply had terminated approximately 50 of its 320 treatment planners at the beginning of 2024, prior to the statements. ¶158. The false claim that Dentsply was hiring rather

than firing was particularly material because it was provided to give credibility to Dentsply's projection of 20% growth in 2024. ¶¶355-57. Statements like these are actionable. *See, e.g.*, *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 942-43 (N.D. Cal. 2022) (statements implying company made no layoffs actionable when company laid off team and implemented hiring freeze).

### B.    Defendants' Falsity Arguments Are Meritless

Defendants raise a limited number of arguments that certain of their statements pertaining to "doctor-directed care" were not false or misleading and that certain other statements that they have otherwise conceded are adequately alleged as false and misleading are nonetheless inactionable for other reasons. As explained below, these arguments contravene well-settled law and ignore, inappropriately dispute, or miscast Plaintiffs' well-pleaded allegations.

### 1.    Plaintiffs Adequately Plead the Doctor-Directed Statements Were False and Misleading

Defendants dispute the falsity of their statements to the effect that Byte treatment was "doctor-directed." MTD at 29-31. This argument lacks merit.

*First*, Defendants ask the Court to find as a matter of law that their statements were true and not misleading because Byte treatment plans were "approved" (*i.e.*, prescribed) by a dentist. MTD at 29-30. This argument improperly rewrites Defendants' statements. Defendants did ***not*** merely say that Byte treatment was approved or prescribed by a dentist; rather, they said that dentists "prescribe ***and oversee***" (¶253), exercise "***oversight and control*** of each customer's clinical treatment (¶¶280, 283), "***oversee***[]" (¶¶254, 274, 287), "***check in*** with customers ***throughout their journey***," (¶261), are available to "***consult***" "***7 days a week***" (¶263), "***direct***" treatment (¶¶265-70, 276-79), "***assess every step***" (¶272), and "***stay with***" the patient and are "***consulted on how to proceed***" (¶287)—which was false. ¶¶101-09. Those statements refer to much more than a dentist's one-time approval or prescription, which is the bare minimum required

27

by the FDA for all clear aligners. ¶58. As *SmileDirectClub* holds, it is misleading to describe a continuing role for dentists when, as here, they have "no meaningful contact with customers" and their involvement is limited to a "superficial" prescription. 633 F. Supp. 3d at 1073-74. At minimum, there is a dispute for the finder of fact as to whether a reasonable investor could understand Defendants' statements to refer to more than a prescription.

Defendants' attempt to deny that the phrase "doctor-directed" refers to "ongoing supervision" by a doctor (MTD at 29) is another premature factual dispute. At this stage, the Complaint's factual allegation about the meaning of that phrase must be accepted. *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 84, 88-89 (S.D.N.Y. 2015) ("Resolving a disagreement over the interpretation of terminology instrumental to the alleged manipulative scheme—as well as the alleged misstatements and omissions—would require assaying the weight of the evidence, which is not permitted when adjudicating a motion to dismiss."). Moreover, as quoted above, Defendants' statements were not limited to that phrase in insolation, but instead explicitly described ongoing supervision, oversight, control, and consultation by dentists. Defendants' own words are consistent with the definition alleged in the Complaint.

Further, even if Defendants had stated only that Byte was approved or prescribed by a dentist, such a statement would still be misleading because the approvals were based on a cursory review of inadequate records and because Dentsply ignored dentists' disapprovals and simply "auto-reassign[ed]" rejected cases to new dentists until they were approved. ¶¶96-100. Moreover, Dentsply's unqualified customer service employees made decisions to "back-track" aligners, which had the effect of altering any treatment plan that was approved by a dentist. ¶¶103-08. Defendants did not fulfill their "duty to tell the whole truth" regarding dentists' involvement in Byte's treatment. *Vivendi*, 838 F.3d at 258.

28

*Second*, Defendants contend their statements about dentist oversight are insufficiently supported by the former employee accounts. ¶¶96-102, 104-07. But Defendants' argument that the FEs are "low level" and could not have known "business-wide practices" (MTD at 30) ignores the Complaint. FE-2—a Senior Software Engineer, who reported to Byte's CTO, who reported to Defendant Gunsagar—designed the company-wide software systems that were used for treatment planning and customer service, and thus was well-positioned to understand the role of dentists and non-dentists. ¶¶97-100 & n.3. FE-3, a Professional Care Specialist from July 2020 to May 2022, personally provided the treatment advice "without the involvement or consultation with any doctor whatsoever," which was "unequivocally not permitted" "per the Company's policy." ¶¶102. 104. FE-4, a Remote Dental Assistant from July to October 2023, likewise was "not permitted to seek input" from dentists, who were "not involved in overseeing their patients' treatment at all," and "at no point . . . consulted." ¶¶106-07. These non-dentists who actually performed the services that Dentsply claimed would be performed by a dentist are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," and thus must be credited. *Ambac*, 693 F. Supp. 2d at 283. The FEs are further corroborated by *The Capitol Forum*—which reported that non-dentists "were trying to act like a doctor or someone that has more medical training," and "were the ones to give [patients] advice"—Dentsply's own MAUDE reports, and a former patient. ¶¶103, 108-09; *see In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *14 (S.D.N.Y. Nov. 26, 2018) (FEs, plus "other corroborative information," "give rise to an inference of falsity").

This is more than sufficient, as the Complaint alleges glaring inconsistencies between Defendants' statements and the true facts reported by these well-placed witnesses, and "such inconsistencies cannot be resolved at this stage of the litigation, when we must accept all factual

29

claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, --- F.4th ---, 2025 WL 2457758, at \*7 (2d Cir. Aug. 27, 2025); *see N.J. Carpenters Health Fund v. Royal Bank of Scotland, PLC*, 709 F.3d 109, 124 (2d Cir. 2013) (crediting FE accounts where, as here, there was "no basis for believing that factors unique to the relevant offices, rather than company-wide practices, resulted in the" facts described).

*Last*, Defendants again re-write their statements to argue that there are insufficient facts demonstrating their statements about the role of dental "professionals" and "customer care teams" (as opposed to licensed "dentists") were not false. But only one alleged misstatement referred to a "dental professional" (¶289; MTD at 31) and not a "doctor," "dentist," or "orthodontist," as in the other statements in this category. Moreover, that statement was in the context of an analyst's question about proposed regulations (*see* ¶¶156-72), where a reasonable investor could understand that statement to refer to a dentist and not just a dental assistant. The two other statements Defendants challenge on this point in fact referred to "licensed" dentists and professionals (¶¶272, 253), and their misleading arguments concerning these "licensed" professionals' role were actionably false for the reasons explained above.

### 2. Defendants' Statements Were Not "Puffery," "Opinions," Or Forward-Looking

#### a. Defendants' Statements Were Not Puffery

The joint Defendants' brief argues that two statements are puffery. MTD at 31-32. Both statements relate to Byte's "conversion rate" (¶¶301, 314), a specific metric that Defendants inflated by intentionally ramping up sales of Byte to contraindicated patients, and then misleadingly touted as driven by legitimate practices. *Supra* §II.D.2.; *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 442-44 (S.D.N.Y. 2018) (rejecting argument that false

attributions of company's success to legitimate factors, rather than bribery scheme, were puffery); *Alexion Pharms.*, 556 F. Supp. 3d at 124-25 (misleading statements regarding "practices surrounding the sale of [] product" were material). Defendants say these statements are puffery because they are about "strong growth" and being "well-positioned for success" (MTD at 32)—completely ignoring the conversion rate. This tactic fails.

Defendants Casey and Gomez also challenge their statements about "substantial compliance" with laws in Dentsply's 10-Ks as puffery. Casey MTD at 28; Gomez MTD at 17. But those were not mere general statements about ethics or optimism; they specifically referenced FDA regulations for "medical devices," including regulations requiring "notification"—the precise regulation that Defendants were violating systematically. ¶¶349-52; *see, e.g.*, *Pirnik* , 2016 WL 5818590, at *2, *5-6 ("We are substantially in compliance with the relevant global regulatory requirements affecting our facilities and products" not puffery); *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *3, *11 (S.D.N.Y. Mar. 28, 2017) ("we believe that we are in compliance in all material respects with all applicable statutory and administrative regulations with respect to our business" not puffery).[4]

In exhibits, but not in the briefs, the joint Defendants label twelve additional statements as puffery, and Casey another three. D.Ex. 19; Casey Appendix A. This is a "flagrant violation of the

---

[4] *City of Brockton Retirement System v. Avon Products, Inc.*, 2014 WL 4832321, at *13-14 (S.D.N.Y. Sept. 29, 2014) (Gomez MTD at 17), involved statements in a corporate code of conduct that the company was subject to the FCPA, not a statement that the company was in compliance with the FCPA, plus statements about ethics (not legal compliance). *In re Lottery.com, Inc. Securities Litigation*, 765 F. Supp. 3d 303, 339-40 (S.D.N.Y. 2025) (Gomez MTD at 17), held that statements about being "operated to ensure" compliance, "firmly committed" to compliance, "monitored . . . to ensure" compliance were puffery. *Id.* But *Lottery.com* held that the statement that the company "only purchase[d] lottery games . . . in accordance with applicable laws" was not puffery, comparing it favorably to the "substantially in compliance" statement in *Pirnik* and *Villella*—the form of statement at issue here. *Id.* at 341.

page limits," *CBS Broad. Inc. v. FilmOn.com, Inc.*, 2010 WL 4840091, at *1 (S.D.N.Y. Nov. 17, 2010) (Buchwald, J.), which were already extended by stipulation. ECF No. 63. Even in the exhibit, Defendants do not explain why these statements are puffery. The Court should not consider these improperly-raised challenges. *In re Acadia Pharms. Inc. Sec. Litig.*, 2020 WL 2838686, at *3 (S.D. Cal. June 1, 2020) (striking chart "presenting additional arguments against falsity which they could not fit" in brief); *Cheng Jiangchen v. Rentech, Inc.*, 2017 WL 10363990, at *5 (C.D. Cal. Nov. 20, 2017) (striking chart of misstatements that "constitutes an extension of Defendants' argument"). Plaintiffs have prepared a responsive appendix, attached hereto as Appendix A, to be considered only if the Court considers Defendants' charts.

In any event, the statements challenged only in the charts are not puffery, but rather specific and misleading statements, for example, about: treatment being "overseen" and "directed" by dentists, ¶254; Byte being different from SmileDirectClub because of the involvement of "license[d] professionals," ¶255; Byte sales being limited to "mild to moderate" rather than "complex" cases, ¶¶259, 291; Dentsply leveraging its purported "expertise" in Quality Assurance and Regulatory Affairs, ¶326; hiring more treatment planners, ¶¶355-57; and the "conversion rate" or "funnel," ¶¶302, 307-08, 314. Each of these statements spoke to key concerns of investors, were "grounded in historical facts," "designed to mislead investors into believing that [Dentsply's] present (as well as its future) was rosier than reality," and thus "properly considered more than mere puffery." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 173 (S.D.N.Y. 2021) (Buchwald, J.).

Whether a misrepresentation is "puffery" depends on "context," including, as here, if it was made "repeatedly" and "in an effort to reassure." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see BHP*, 276 F. Supp. 3d at 80 (statements about "commitment to

32

safety" made "over and over and over" not puffery). Here, investors were concerned about the safety and viability of DTC aligners, and Defendants made repeated misstatements in an effort to reassure them that Byte was different. *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements "clearly designed to distinguish the company from other specified companies in the same industry" not puffery). Indeed, several of the statements labelled by Defendants as puffery were made in response to specific questions from analysts. ¶¶255, 259, 307, 314, 326, 355-57; *see SEC v. Farnsworth*, 692 F. Supp. 3d 157, 180-82 (S.D.N.Y. 2023) ("direct response to concerns raised by investors about a specific risk" not puffery).

None of the misstatements are mere "general statements about reputation, integrity, and compliance with ethical norms," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), a "hopeful outlook," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), or "expectations of business success," *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018) (MTD at 31). Nor were they "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *UBS*, 752 F.3d at 183. They are actionable. *Aegean*, 529 F. Supp. 3d at 173.

### b.    Defendants' Statements Are Not Protected Opinions

The joint Defendants' brief argues that four statements are protected opinions. MTD at 32-34. Casey and Gomez each echo the challenge to one of the four statements, and Casey challenges one more in a footnote. Casey MTD at 28-29 & n.6; Gomez MTD at 16-17. These arguments fail.

The protection for opinion does not extend to statements of fact, *i.e.*, "a thing done or existing or an actual happening," even when facts "are subject to misreading, misinterpretation, or misapplication." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40, 46 (2d Cir. 2023); *see Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 142 (2d Cir. 2017) (whether home loans conform to underwriting

33

guidelines "is unquestionably one of provable fact," not opinion). And even a statement of opinion is actionable if "disbelieved" or "even if believed . . . if it contains a factual misstatement or is rendered misleading by the omission of material facts." *DeCarlo*, 122 F.4th at 40. "[A] reasonable investor expects that opinion statements rest on some meaningful inquiry, fairly align with the information in the issuer's possession at the time, and do not reflect baseless, off-the-cuff judgments." *Id.* at 41. "When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020).

The statements that Dentsply was in "substantial compliance" with FDA medical-device regulations (¶¶349-50) is actionable. First, Dentsply's compliance was not a matter of opinion. *DeCarlo*, 122 F.4th at 40; *FHFA*, 873 F.3d at 142. The relevant regulation does not provide for any discretionary or subjective decision. ¶¶316-25. It is a fact, for example, that a lost tooth is a permanent injury. Second, even if Defendants somehow believed that they were permitted to conceal thousands of injuries, the "sheer volume of competing facts" (the omitted injuries, as well as the lack of dentist oversight and intentional targeting of contraindicated patients that contributed to them) would "substantially undermine" a reasonable investor's conclusion. *Abramson*, 965 F.3d at 177-78; *see BioScrip*, 95 F. Supp. 3d at 731 (even if defendants believed legal problem "was a minor issue," "a reasonable investor would feel entitled to an explanation"). Third, the Complaint plausibly alleges disbelief: Dentsply's policy required reported all lost teeth, yet hundreds were concealed, ¶¶133, 135, 139-40; and management acknowledged "we know our complaints aren't being filed correctly," ¶¶176-79. It is implausible that Defendants believed they could conceal

34

each of the **6,894** retrospectively-reported injuries—for reasons unknown, with which they have never come forward.[5]

Defendant Casey's statement that Dentsply's "expertise" in Quality Assurance (QA) and Regulatory Affairs (RA) would "avoid some of the traps" that befell SmileDirectClub is actionable too because Dentsply had not at that time implemented "appropriate [QA and RA] practices with respect to Byte" (and, indeed, never did). ¶¶326-27. It had taken no steps to remedy the deficiencies (as described by FE-1 and FE-2) in dentist supervision and patient screening that existed before the acquisition and continued unabated. ¶¶96-101. Disclosure of those omitted facts would "substantially undermine" a reasonable investor's conclusion that Byte would leverage Dentsply's expertise. *Abramson*, 965 F.3d at 177-78. Casey's quotation of this statement (Casey MTD at 28) entirely omits, and therefore fails to address, the reference to QA and RA.[6]

Byte's conversion rate (¶¶305, 310) is not an opinion at all, but rather an "objectively verifiable" metric that was misleadingly presented. *In re Chicago Bridge & Iron Co. N.V. Sec. Litig*., 2018 WL 2382600, at \*6 (S.D.N.Y. May 24, 2018). Defendants' statements about

---

[5] In *Lottery.com* (Gomez MTD at 17), the legal problems were due to a failure of "geofencing technology" that caused the company to sell to out-of-state customers who were spoofing their location. *Lottery.com*, 765 F. Supp. 3d at 333, 341-42. Here, there was no technological failure; the injuries reached Defendants through software and/or human reports, yet they were concealed from the FDA. ¶¶130-32. Moreover, unlike the lottery regulations, the relevant FDA rules specifically imposed a duty on management with executive responsibility. ¶¶136, 321-22. Further, Dentsply broke the law for nearly every Byte injury. ¶¶137, 150-51.

[6] In *Gregory v. ProNAi Therapeutics Inc.*, the facts plaintiffs "fault" defendant for omitting did "not conflict with the information a reasonable investor would take from the statements of opinion at issue." 297 F. Supp. 3d 372, 407 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). Here, the omitted facts concerning the similarities between Byte and SmileDirectClub's "customer experience" directly contradict the notion that Byte's "customer experience" was a "sustainable advantage" by comparison. ¶¶57-63, 65, 154-55, 273, 327. These facts were highly material to investors, given the 16% decline in SmileDirectClub's stock that occurred when its business practices were first scrutinized by the media just a year before Defendant Casey's statement was made. ¶51.

35

the conversion rate were misleading because they omitted the illegitimate reason for its growth, which misleading impression was in no way remedied by couching other parts of the statements with language like "[I] think." *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015) (statements prefaced by "magic words" "remain perfectly capable of misleading investors").[7]

In a terse footnote, Casey challenges one additional statement as an opinion because he used the words "we feel." Casey MTD at 29 n.6. Those words did not qualify his claim that "Byte was built from the beginning . . . with a full network of license professionals involved." ¶255. Whether a task is performed by a dentist or a non-dentist is an "objectively verifiable" non-opinion. *Chicago Bridge*, 2018 WL 2382600, at *6. It was misleading by omission—particularly in the context of a question about how Byte was differentiated from SmileDirectClub—to tout the involvement of dentists while omitting facts that substantially undermined dentists' involvement, including the extensive and unsupervised role of non-dentists and the limitation of dentists to a single approval, hastily given based on inadequate information.

In exhibits, but not the briefs, the joint Defendants label 17 more statements as opinion, and Casey another three. D.Ex. 19; Casey Appendix A. These unbriefed and unexplained arguments should not be considered. *Supra*, pp. 31-32. In any event, they are without merit. For example, the other statements about dentist oversight (¶¶254-55, 267, 274) were objectively verifiable non-opinions and misleading by omission for reasons similar to those discussed above, plus later, the auto-reassignment of unapproved cases. It was likewise misleading to tout Byte's patient standards (¶¶258-59, 291) while omitting the substantially undermining facts that Byte

---

[7] The additional statements about the conversion rate identified only in D.Ex.19 (¶¶301-302, 304, 307-308, 314) are actionable for the same reason.

systematically failed to collect the information necessary to apply those standards and then further undermined them by auto-reassigning cases and then intentionally targeting contraindicated patients. Campion and Coleman's statements that Dentsply was hiring treatment planners (¶¶355-57) are also "objectively verifiable" non-opinions. *Chicago Bridge*, 2018 WL 2382600, at \*6. That false embedded fact makes actionable the statements in which it was embedded. Even if Dentsply had hired someone, it was misleading by omission to tout hiring while omitting mass layoffs.

### c. Defendants' Statements Were Not Forward-Looking or Protected by the Safe Harbor

The joint Defendants' brief argues one misstatement is protected by the PSLRA's safe harbor for "forward-looking" statements (and, in D.Ex.19, improperly argues others are too). MTD at 34-35. The statement challenged in the brief lied about past events, falsely stating that "*[w]e already started*" "investing more in . . . treatment planners," even though Dentsply had just conducted a mass layoff of them. ¶355. The other two misstatements about treatment planners (in D.Ex.19) were also in the past tense: "*[w]e have invested* . . . increasing the number of treatment planners" and "*[w]e invested* in . . . more treatment planners. . . . *That was all done* in the early part of Q1." ¶¶356-57. There is no safe harbor for lies about the past or present. *Vivendi*, 838 F.3d at 246 ("non-forward-looking elements" and "mixed present/future statements" not protected). Further, there was no meaningful cautionary language that warned Dentsply might actually be firing treatment planners when it said it was hiring, and it is plausible that Campion and Coleman actually knew whether or not Dentsply was hiring treatment planners when they chose to speak to that issue. ¶¶370-74. The risk factor identified by Defendants (MTD at 35 (citing D.Exs. 1-4) is a

boilerplate warning about legal compliance that does not "relate directly" to the misleading impression. *Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 729 (2d Cir. 1998).[8]

Casey challenges another statement as forward-looking, but it likewise misleadingly states past and present facts. Casey MTD at 29; ¶255 ("***Byte was built from the beginning*** . . . with a full network of license[d] professionals involved."). Further, there was no meaningful warning about the limited and ineffective role of dentists or the extensive medical advice provided by unqualified non-dentists. The general risk factor about legal compliance does not "relate directly" to those matters. *Hunt*, 159 F.3d at 729. The Complaint plausibly alleges Casey's actual knowledge given his role spearheading the acquisition and his statements admitting knowledge, including his admission that he read Byte patient feedback daily. ¶¶31, 218-19.

In exhibits, but not the briefs, the joint Defendants label six more statements as forward-looking, and Casey one of those six. D.Ex. 19; Casey Appendix A. These unbriefed and unexplained arguments should not be considered. *Supra*, pp. 31-32. In any event, they are without merit. These statements also misstated past or present events. ¶259 ("***we're very focused*** on mild to moderate occlusion"); ¶308 ("***[W]e have*** a more focused funnel. ***We validate*** customers as they enter the funnel."); ¶314 ("***We have focused the last 12 months*** . . . on the top of the funnel on our conversion rates."). Further, there was no meaningful warning that Byte treatment was not overseen by dentists, that Byte was sold to contraindicated patients, or that such intentional sales were driving the conversion rate, and the Complaint plausibly alleges that Defendants spoke with actual knowledge about these matters. ¶¶370-74. The general risk factor about legal compliance does not "relate directly" to these matters either. *Hunt*, 159 F.3d at 729. The statement that

---

[8] Defendants do not contend that the misstatements about legal compliance are forward-looking.

Dentsply expected "organic growth" (¶353) was made after Dentsply already knew that the FDA was focused on Byte injuries and Dentsply's failure to report them. ¶¶144, 176-77, 354.

### 3.    Defendant Casey's Separate Falsity Arguments Also Fail

Defendant Casey raises other arguments about the falsity of his statements. These fail.

**Customer Standards**. Casey argues that his statements about customer standards were true because Dentsply first abandoned customer standards in August 2022 after Casey was terminated. Casey MTD at 26. This is incorrect. While Dentsply intentionally accelerated its targeting of contraindicated patients at that time, Byte was systematically sold to contraindicated patients at all times, including before Casey's statements. FE-1, a treatment planner since 2020 (before the acquisition), describes how "most of the time key pieces of information" were missing or incomplete, including the "medical history or photos" necessary to screen for contraindications. ¶96. FE-2, a senior software engineer since 2019, corroborates FE-1 and further describes how known contraindications were "override[n]" and the cursory nature of the dentist approval process that, for example, required only four clicks and did not require dentists to actually "scroll through" the materials necessary to identify contraindications. ¶¶97-99.

**FDA Reporting.** Casey also argues that certain statements—(1) his January 13, 2021 statement about Dentsply's "expertise" with Quality Assurance and Regulatory Affairs (¶326) and (2) his statements in Dentsply's 10-Ks and 10-Qs about "substantial compliance" (¶¶349-50)—are true because Dentsply has not yet admitted failing to report a sufficient number of injuries occurring prior to those statements. Casey MTD at 27. Casey is wrong.

By the times of the 10-Qs for 2Q and 3Q 2021 (filed August 5, 2021 and November 4, 2021) and 10-K for 2021 (filed March 1, 2022), Dentsply had concealed a material number of injuries: at least 16 (87%), 199 (99%), and 377 (99%), respectively, based on Dentsply's own

39

retrospective reporting. ¶352.[9] The Complaint plausibly alleges that these suppressed injuries made the statements Casey signed materially misleading. While Dentsply's aggregate number of suppressed injuries during the Class Period (at least 6,894) is particularly outrageous, the failure to report even one injury is sufficient to expose a manufacturer to penalties, including criminal, for misbranding. ¶323. The suppression of even a small number of adverse events can make a statement to investors materially misleading. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45-47 (2011) (suppression of "more than 10" adverse events sufficient to allege materiality).

The Complaint plausibly alleges that Dentsply was substantially not in compliance at the time of the 10-K for 2020 (filed March 1, 2021) and 10-Q for 1Q 2021 (filed May 6, 2021) too. ¶351. Dentsply excluded injuries occurring prior to May 17, 2021 from its retrospective review, and it has admitted failing to report serious injuries for every month covered by its retrospective review. ¶148. That supports a plausible inference that Dentsply and Byte were concealing injuries at all times (and are still concealing injuries occurring prior to May 17, 2021). And regardless of the number of unreported injuries, at all times, Dentsply had "no effective system for reporting," as the FDA's Quality System Regulation rule requires. ¶¶316-25, 351.

Casey's January 13, 2021 statement—touting Dentsply's "expertise" in Quality Assurance and Regulatory Affairs as an advantage for Byte—was likewise misleading because Byte had a grossly ineffective QA and RA function. ¶¶326-27. That allegation is plausible considering the Complaint in its entirety, including the dangers from the lack of dentist oversight and sales to contraindicated patients and the fact that Dentsply has admitted concealing at least 6,894 serious

---

[9] The 377 figure is the number of injuries occurring in 2021 but not timely reported as per Dentsply's retrospective reports. ¶352. Approximately 200 additional concealed injuries occurred between year end and the filing of the 10-K on March 1, 2022. ¶¶144-45. During Casey's tenure (until April 19, 2022) there were at least 739 concealed injuries. ¶137.

patient injuries during the Class Period. Casey's statement was misleading regardless of whether there were concealed injuries at that time, although again, the reasonable inference is that there were, including injuries occurring before the acquisition.

### 4.    All of the Challenged Statements Are Attributable to the Company

Dentsply wrongly disputes that two categories of its statements—Dr. Angela McMullin's statements to the Florida legislature on Dentsply's behalf and a statement made by Dentsply to a William Blair analyst and disseminated by that analyst—are not attributable to Dentsply. MTD at 35-36. The law is otherwise. The Complaint plausibly alleges that Dentsply had "ultimate authority" over Dr. McMullin's statement and the statement that Dentsply made to the analyst, and is thus its "maker." *Janus Cap. Grp. Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

William Blair disseminated a statement from Dentsply "management." ¶337. Dentsply is liable for a statement made by its management, including its further dissemination. *Basic Inc. v. Levinson*, 485 U.S. 224, 227 & n.4 (1988) (statement by company president published in newspaper); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) (company liable "when statements in analysts' reports clearly originated from the defendants . . . even if they are not exact quotations"). The Complaint alleges that management gave the analyst a false reason for the uptick in MAUDE reports, which plausibly alleges that Dentsply "intentionally foster[ed] a mistaken belief concerning a material fact" that was incorporated into the analyst report. *Novak v. Kasaks*, 216 F.3d at 314. There is no *Janus* problem "because the report attributed the statement to [defendant] and the context of the statement indicates that he exercised control over its content and the decision to communicate it to [analyst]." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 689 (3d Cir. 2023).

Dr. McMullin expressly stated that she was testifying "on behalf of . . . Dentsply Sirona." ¶286. *Janus* supports liability for the principal as a "maker" when an agent makes a statement "on

41

behalf of another." 564 U.S. at 142; *see In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 657-58 (2d Cir. 2016) (genuine dispute of fact as to whether Pfizer had "ultimate authority" over statements made by employees of two other pharmaceutical companies to press pursuant to "Co-Promotion Agreement" between those companies and Pfizer); *In re Merck & Co., Inc. Sec., Deriv., & ERISA Litig.*, 2011 WL 3444199, at *25 (D.N.J. Aug. 8, 2011) ("*Janus* does not alter the well-established rule that a corporation can act only through its employees and agents."). Dr. McMullin's statement that she was testifying on behalf of Dentsply is plausible on its face, was not disavowed by Dentsply until this litigation, and is corroborated by Dentsply's extensive lobbying campaign. ¶¶162-63, 217. Separately, and regardless of whether Dentsply is the maker, Dr. McMullin's liability is imputed to Dentsply as her principal under the ordinary law of agency. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494-97 (3d Cir. 2013).

## IV.     THE COMPLAINT ALLEGES A STRONG INFERENCE OF SCIENTER

### A.     The Pleading Standard under the PSLRA

The Complaint pleads a strong inference of scienter. A strong inference "need not be irrefutable," *i.e.*, of the "'smoking-gun' genre," nor "even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Rather, a complaint should be sustained "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In determining whether scienter is pled, "courts must, as with any motion to dismiss . . . accept all factual allegations in the complaint as true." *Id.* at 309. The inquiry is "whether '*all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Id.* at 322-23; *see Ambac*, 693 F. Supp. 2d at 264.

Plaintiffs can plead scienter by alleging a motive and opportunity to commit fraud, as well as through circumstantial evidence of recklessness. *See Ambac*, 693 F. Supp. 2d at 266. "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The Complaint pleads scienter under all four circumstances, individually and taken collectively.

### B.    The Complaint Adequately Alleges Scienter

#### 1.    The Complaint Alleges the Executive Defendants' Scienter

The Complaint alleges scienter by the Executive Defendants based on several circumstances that, individually and taken together, create a strong inference of scienter. For example, Campion and Frank engaged in deliberately illegal behavior by knowing and/or approving of the order to Byte's salesforce to stop informing patients of contraindications, and then misleadingly touting the improvement in Byte's conversion rate that they knew was driven by that directive—a fact corroborated in detail through the accounts of two independent high-ranking and well-placed witnesses. ¶¶113-16; *infra*, pp. 44-45. That reckless decision, which predictably resulted in a deluge of serious patient injuries, can only be explained in the context of Dentsply's ongoing scheme to deliberately remove the oversight of licensed dentists and to conceal injuries to avoid the FDA's scrutiny. Indeed, the fraud continued for four years, resulting in thousands of serious patient injuries, requiring coordinated deception between multiple departments within Byte and at the Dentsply corporate level, which was (and could only have been) orchestrated by the Executive Defendants.

43

The patient injuries in particular were meticulously tracked by Dentsply and escalated up to the Executive Defendants through purpose-built software and/or periodic reports prepared and delivered by quality executives. ¶¶130-33; *infra*, pp. 46-47. Each Executive Defendant was a member of "management with executive responsibility," and thus had a legal duty to monitor this information. Given the quantity and quality of the suppressed injuries, which dwarfed the *de minimis* reported injuries, the strongest inference is that Defendants suppressed them, not because the unreported injuries were immaterial, but because they knew that reporting and disclosing them would mean the end of the Byte business (as, in fact, later occurred).

By choosing fraud, the Executive Defendants maintained Byte as a critical part of Dentsply's business at two critical times, first during an attempt to conceal pandemic headwinds— an attempt that also motivated a second "channel stuffing" fraud—and then as Dentsply was attempting to recover from the revelation of the channel stuffing fraud. *Infra*, pp. 49-50. Also inconsistent with an innocent mistake are the Executive Defendants and analysts' consistent focus on Byte, Defendants' deception of constituencies in addition to investors (including the FDA), Dentsply's admitted improper "tone at the top," and at least four suspicious executive departures that coincided with the start of Dentsply's purported remediation. *Infra*, pp. 50-57. Not coincidentally, the Executive Defendants pocketed millions of dollars of cash bonuses and stock awards directly linked to performance metrics inflated by the fraud and pushed above minimum thresholds only because of the fraud. *Infra*, pp. 54-55.

Defendants offer no innocent explanation that can account for the confluence of all these circumstances, let alone one that is more compelling than the inference of scienter.

**Intentional Targeting of Contraindicated Patients**. Defendants knew their statements to investors about the safety of Byte were false and misleading, or were extremely reckless, because

they knew Byte was unsafe and they actively made it less safe. For example, the directive to stop informing patients of contraindications—delivered by Tyler Stoker, Byte's Head of Sales and Business Development, to Byte's sales force in August 2022—was given with the knowledge and/or approval of Campion and Frank. ¶¶113-17, 210, 221. The directive was given the same month that Campion was appointed as CEO and followed a few months after Frank's appointment as EVP, Product Group. ¶¶211-12. Frank reported to Campion, participated in all major decisions affecting Byte, had "specific responsibility to 'oversee'" the metric (Byte's conversion rate) boosted by that directive. ¶¶37, 221. After the directive, Campion and Frank (plus Coleman, who became CFO in September 2022) touted the improved rate, falsely attributing it to legitimate practices, ¶¶211-12, 301-15, and continuing to tell investors that Byte was sold only to appropriate candidates for treatment. ¶¶294-98. As confirmed by former employees, this directive was explicitly "tied to Byte's need to improve its numbers, to ensure bonuses would be paid, and to keep the new CEO happy." ¶116. Commanding salespeople to deceive patients into using a dangerous and contraindicated medical device is a classic example of "deliberately illegal behavior," which alone supports scienter. *Blanford*, 794 F.3d at 306. That Campion, Coleman, and Frank believed they could get away with it confirms their knowledge that the resulting injuries would not be observed by overseeing dentists and would be concealed from the FDA.

**Scale, Scope, Duration, and Seriousness of the Fraud**. The Complaint alleges widespread, illegal business practices that suffused every aspect of Byte's business, which was one of Dentsply's most important products and its fastest growing business unit. As described by former employees, the Byte scheme depended on deception at every level. FE-1, a treatment planner, describes how he and other non-dentists in Costa Rica were forced to plan most treatments without medical histories or photos necessary to identify contraindications; and that treatment

45

planners were being fired when Campion and Coleman claimed to be hiring. ¶¶96, 158. FE-5 and FE-6, salespersons, describe how they and their teams were ordered to push Byte on contraindicated patients. ¶¶113-16, 119. FE-3 and FE-4, customer service representatives, explain that they and other non-dentists on their teams directed patient treatment without any oversight from dentists—with often disastrous results. ¶¶104-07, 117, 119. FE-8, a records specialist, reports that management was aware of the underreporting of Byte injuries by at least 2023 but ordered employees not to speak to the FDA. ¶144.

The practices posed obvious and unacceptable safety risks to patients and predictably resulted in thousands of serious patient injuries, nearly all of which were unlawfully concealed from the FDA—risking criminal liability. It continued for four years, and once revealed, resulted in the shuttering of the Byte business. ¶¶134-51, 213, 222. A fraud of this scale, scope, duration, and seriousness could not have escaped the attention of the Executive Defendants. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 215 (2d Cir. 2020) ("seriousness of the impact that results from [Defendants'] conduct" supports scienter); *In re Alstom SA*, 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) ("magnitude" of the conduct and "the significant length of time (several years) during which the arrangements were not disclosed, together could enable a reasonable fact finder to draw a strong inference of recklessness"); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 524 (E.D.N.Y. 2025) (strong inference of scienter where executives made statements about "protection" of clients "when the adequate safeguards were, at that time, missing").

**Defendants Had a Legal Duty to Track Injuries, and They Did**. The Byte fraud did not escape the Executive Defendants' attention. Dentsply had personnel and software whose purpose was to escalate quality issues, such as patient injuries, to the Executive Defendants, and they closely monitored that information (but failed to take corrective action, including reporting the

46

injuries to the FDA). Each of the Executive Defendants was a member of "management with executive responsibility." ¶17.[10] Under FDA regulations, they had duties, among other things, to "review . . . the effectiveness" of Dentsply's quality system (which includes the reporting of serious patient injuries to the FDA) and to "ensure" that its quality policy was "implemented." ¶¶214, 316-25 (citing 21 C.F.R. § 820.20(a), (b)(3), (c)). Dentsply's quality policy required, among other things, reporting all lost teeth to the FDA. ¶133. As a result of Dentsply's retrospective admissions, the Complaint alleges in detail thousands of unreported injuries (including more than one hundred lost teeth) that the Executive Defendants had access to, received reports about, and had a duty to monitor. ¶¶135-50. Thus, even if the Executive Defendants were somehow unaware of the injuries (and, to be clear, they were not), at minimum their statements would be reckless because they "failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306.

Dentsply actively tracked Byte patient injuries in internal quality databases (to which at least Gunsagar and Brackett personally had access); at least Gunsagar and Brackett "personally reviewed" customer complaints and "participated in Dentsply's response to FDA concerns regarding the same"; and, as described by FE-7, Dentsply's Director, Corporate Compliance and Regulatory Affairs from 2003 until 2019, Dentsply's top quality executive met quarterly with senior executives (including at least the CEO, Casey and Campion) to keep them updated on patient injuries. ¶¶130-33, 138, 213-15.

Dentsply's admissions in retrospective MAUDE filings show that, even though Dentsply reported barely any Byte injuries to the FDA until September 2024, there were dozens to hundreds of serious injuries nearly every month during the Class Period. ¶¶135-51. In light of Dentsply's

---

[10] "Management with executive responsibility" includes "those senior employees of a manufacturer who have the authority to establish or make changes to the manufacturer's quality policy and quality system." 21 C.F.R. § 820.3(n).

47

infrastructure for tracking injuries, ¶¶131-32, the use of which for Byte was touted by Casey, ¶61, and Dentsply's admission of when it became aware of the belatedly reported injuries, ¶¶137-38 & n.8, the strongest inference is that Casey and Campion's briefings and Gunsagar and Brackett's reviews revealed at least the injuries that Dentsply has belatedly reported and admitted knowledge as of dates certain during their tenures. Defendants' knowledge of these injuries and access to these databases and briefings supports their scienter. *Setzer*, 968 F.3d at 215 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

The quantity and quality of the concealed injuries is inconsistent with innocent mistake. For example, during Campion, Brackett, Gunsagar, and Casey, tenures, Dentsply failed to timely report at least 5,289, 3,959, 1,201, and 739 serious patient injuries, respectively. ¶137. During Casey and Gunsagar's tenures, the unreported Byte injuries were at least *99%* of all Byte injuries; during Campion and Brackett's tenures, at least 80% and 76%, respectively. *Id.* Quantitatively, the numbers and percentages of injuries suppressed are staggering. Qualitatively, the substance of the patient complaints—which were entered into Dentsply's quality system, and later, belatedly filed with the FDA—reveal that many injuries were particularly gruesome and indicative of an obvious lack of dentist oversight and/or with contraindications. *E.g.*, ¶¶108, 123-28.

FE-8, a Records Specialist, states that management acknowledged Dentsply's underreporting of Byte injuries in 2023 and that there was a second meeting in June 2024 where management acknowledged that injury reports could be capturing the FDA's attention, and prohibited employees from speaking to the FDA without management present—a measure that acknowledges culpability and demonstrates management's efforts to conceal. ¶144.

Defendants had compelling motives to misrepresent Byte's safety profile: to gain access to a lucrative and fast-growing "$5 billion category" of DTC products; to boost Dentsply's earnings per share at crucial times, when facing pandemic headwinds, and then while recovering from the channel stuffing fraud; and to deceive legislators and regulators that Dentsply was actively lobbying to keep Byte in business. ¶¶49, 66-89, 152, 156-72, 212, 216-19, 223. These corporate-level motives—which more plausibly would have been pursued by the Executive Defendants than by lower-level employees—support scienter for both Dentsply and the Executive Defendants. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 81 (2d Cir. 2021) (motive alleged by scheme that "would have allowed the bank to profit substantially" and to realize division's "strategic goal"); *Sharette*, 127 F. Supp. 3d at 95-96 (scienter alleged by corporate-level motives that "encompass larger and longer-term financial ends," such as "improve their ability to access a specific and extremely profitable market, potentially worth billions of dollars").

These circumstances create a strong inference that Defendants concealed patient injuries and violated Dentsply's own quality policies (which required reporting lost teeth) not because they believed the injuries were unimportant but rather because Defendants understood that they were highly material and would move the market if disclosed. *See Matrixx*, 563 U.S. at 49 (crediting "inference that Matrixx elected not to disclose the adverse event reports not because it believed they were meaningless but because it understood their likely effect on the market"); *Setzer*, 968 F.3d at 213 n.12, 215 (that misstated facts are "material" and "sufficiently serious" supports inference Defendants "had to know that revealing the full [truth] would have been troubling news to [the company's] investors"). In *Matrixx*, a strong inference of scienter arose because Matrixx suppressed "more than 10" adverse event reports. 563 U.S. at 45. Here, Defendants suppressed at

49

least **6,894** adverse event reports. Further, unlike here, Matrixx did not violate any FDA reporting obligation. *Id.* at 39 n.5.

Indeed, despite filing 6,894 "retrospective" Byte injury reports with the FDA—each admitting that Dentsply was aware of the injury months or years earlier—Dentsply has never publicly claimed (or explained how) any failed to reach the attention of its quality executives or the Executive Defendants; nor has it claimed (or explained why) it previously determined any did not require reporting.

**Byte Was a Key Part of Dentsply's Business at a Critical Time**. Byte was a massive investment for Dentsply, which Defendants represented was critical to the company's earnings-per-share targets and strategic goals. ¶¶218-19, 223. The fraud occurred at a critical time for Dentsply, ¶212, both initially, while Dentsply's traditional products were facing headwinds, ¶¶66-70, and subsequently as new management attempted to regain investor trust after the channel stuffing fraud. ¶¶72-89. Campion stated that "Byte has a *key role* in our portfolio." ¶81. Coleman called Byte a "*bright spot[]*" in Dentsply's business, which was otherwise reeling in the aftermath the channel stuffing. ¶82. Byte was one of five "*core strategic objectives*"—and the only single product line mentioned—in Dentsply's plan to achieve $3 EPS, its "Rubicon." ¶¶86, 219. It is reasonable to infer that the Executive Defendants monitored Byte closely because it played a key role, was a bright spot, and constituted a core strategic objective. *Setzer*, 968 F.3d at 215 ("seriousness of the impact that results from their conduct" supports scienter); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc.*, 732 F. Supp. 3d 300, 319-20 (S.D.N.Y. 2024) (CAD/CAM and imaging products—which comprised only 13% of Dentsply's net sales—was "key to the company's profits and digitally driven restructuring plan, so Casey and Gomez would have monitored them closely").

**Defendants Orchestrated the Scheme**. The scheme required sustained and coordinated deception, for four years, across multiple departments within the Byte subsidiary (including treatment planning, sales, and customer service) and at the parent-company level (including quality, regulatory, and political affairs). ¶¶110-17, 134-55, 173-79. That type of fraud could only have been orchestrated from the top, with the knowledge and approval of the Executive Defendants, and the Complaint alleges that they specifically directed the fraud:

For example, Gunsagar knew that the role of dentists was limited to a single approval followed by no oversight because he "directed and enforced" that policy. ¶220. FE-2, a Senior Software Engineer for Byte from February 2019 to January 2022, created the software systems used for Byte treatment planning and customer service—which limited dentists' role—at the direction of Gunsagar and his direct reports and participated in meetings with Gunsagar where these systems and limits were discussed. ¶¶97-101, 220. These facts contradict Gunsagar's statements, for example, that dentists "prescribe and oversee" Byte treatment. ¶253. Because dentists were charged with protecting patients from contraindications and injuries, Gunsagar's decision to curtail their role supports his scienter as to all statements. He was Byte's long-time CEO, and he directly supervised Byte's lead dentist, dentist liaison, Director of Clinical Support, and CTO. ¶¶38, 97 & n.3, 99, 220. Before the acquisition, Byte "was a small company that focused on the production of just one product," which further supports Gunsagar's scienter. *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014). His knowledge is imputed to Dentsply, including the knowledge he gained pre-acquisition. *See Genesee Cnty. Emps.' Ret. Sys. v. DocGo Inc.*, 773 F. Supp. 3d 62, 88 (S.D.N.Y. 2025).

Similarly, Brackett succeeded Gunsagar as head of the Byte business (as Dentsply's SVP, Orthodontic Aligner Solutions & Customer Experience) and had other reasons to be familiar with

51

compliance and patient risks given her additional hats as Head of Sustainability and Chair of the ESG Committee. ¶¶39, 221. If there were a nationwide network of dentists overseeing patient care (there was not), Gunsagar and Brackett would have known because they would have been at its helm. Given the nature of these misstatements, Gunsagar and Bracket's "direct involvement . . . in the day-to-day operations of the company," together with the magnitude and duration of the fraud, support a strong inference of scienter. *Alstom,* 406 F. Supp. 2d at 460.

Casey and Gomez also observed (or were extremely reckless in failing to notice) the lack of dentist oversight and lack of patient standards, including when, prior to the Class Period, they led the acquisition from Dentsply's side. ¶¶31-32, 218; *see In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (executives' role in acquisition supported scienter for facts "critical to the acquisition"); *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 210 (S.D.N.Y. 2016) (role in acquisition "could plausibly have given the executives ample information" about regulatory violations at acquired company). Under Casey, Gomez, and Gunsagar's watch, shortly after the acquisition, the lack of dentist oversight was not remedied but rather became more problematic because Dentsply began "auto-reassigning" rejected cases until they were approved, meaning that a patient could be approved for treatment even if two out of three dentists determined that they were dangerously contraindicated. ¶100.

Campion and Frank kept the above policies in place and oversaw a new policy that forbade Byte's sales force to inform patients of contraindications. ¶¶113-17, 210, 221. The alarming decision to push Byte on contraindicated patients confirms their knowledge that no overseeing dentist or FDA reporting stood in their way. That the Executive Defendants "orchestrated" the fraud "would give them actual knowledge." *San Antonio*, 732 F. Supp. 3d at 317-18; *see In re*

52

*Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764-65 (S.D.N.Y. 2017) (scienter supported because CEO and other defendants "were directly involved").

Defendants' fraudulent scheme to conceal Byte's unsafe practices and the resulting patient injuries required widespread deception—not only of investors, but also of the FDA, legislators (who Dentsply was actively lobbying), medical associations and doctors, and patients. ¶¶152, 156-72, 216-17. The corruption of Dentsply's quality, regulatory, and political affairs functions—all of which operated at the parent-company level—confirms the Executive Defendants' role in orchestrating the fraud. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 838 (N.D. Cal. 2014) (concealed patient injuries and "FDA violations" support scienter); *In re Firstenergy Corp.*, 2022 WL 681320, at *22 (S.D. Ohio Mar. 7, 2022) ("It is difficult to imagine such a scheme emerging without scienter.").

**Defendants' Admissions and Inappropriate Tone at the Top**. As Dentsply has admitted, Casey and Gomez created a "inappropriate tone at the top" that demanded cheating by subordinates, on threat of retaliation, and Dentsply lacked effective disclosure controls. ¶¶78, 227. As described by FE-3, FE-4, and FE-8, these issues continued under the tenures of Campion, Coleman, Frank, and Brackett. ¶¶104-07, 117, 119, 144. This supports a strong inference that the misconduct occurred with the Executive Defendants' knowledge and approval, rather than resulting from the independent initiative of culpable subordinates. *Blanford*, 794 F.3d at 308 (scienter supported when "high level managers discouraged questions" and "complaints fell on deaf ears"); *San Antonio*, 732 F. Supp. 3d at 321 ("Courts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter." (collecting cases)); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("Courts in this District have repeatedly held that weak internal controls will support an inference of scienter."

53

(collecting cases)); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551-52 (S.D.N.Y. 2017) ("internal control deficiencies," including "tone at the top" and disclosure controls, make it plausible that "fraud flowed from the top-down").

**Executive Defendants Departed under Suspicious Circumstances**. Dentsply cleaned house by exiting Frank, Coleman, and Brackett, plus quality executive Hannah Seevaratnam, between May and early September 2024—prior to the dramatic spike in Dentsply's reporting of injuries to the FDA. ¶¶232-35. As when Casey and Gomez departed following the discovery of the channel stuffing fraud, ¶¶228-30, "the timeline itself is suggestive," and there were "too many departures to say that they were coincidental with a straight face." *San Antonio*, 732 F. Supp. 3d at 321-22. Dentsply gave a "pretextual reason" for Frank's departure (¶233) and attempted to conceal Brackett's departure (¶235), further supporting this inference. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014). During the briefing of this motion, Campion, the last Executive Defendant left standing, departed too.

**Personal Financial Incentives**. Casey, Gomez, Campion, Coleman, and Frank personally pocketed millions of dollars in cash bonuses and/or stock awards tied to EPS and organic sales metrics that were pushed above minimum thresholds only because of ill-gotten Byte sales. ¶¶236-47. Gunsagar also received $19.6 million tied to a Byte performance metric. ¶231. This compensation supports scienter because there is a "direct link between the compensation package and the fraudulent statements." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP 111Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009); *see also Set Cap.*, 996 F.3d at 81 (motive alleged because, in addition to corporate motives, individual defendant "was awarded a $10.2 million bonus for successfully shifting Credit Suisse away from volatile assets such as XIV Notes"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (scienter

supported by bonuses creating "specific motive to lie," "since doing so would allow them to reap a concrete benefit in the form of bonuses amounting to nearly 60% and 49% of their base salaries"), *aff'd in part, vacated in part, remanded sub nom. Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020); *In re Vivendi Universal S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (executive received "'concrete and personal benefit' in the form of a bonus worth more than $3 million, amounting to two and half times his normal salary, for boosting [company's] EBITDA by more than 30% in 2001").[11]

In the separate securities fraud action pending in this District concerning Dentsply's channel stuffing in 2021, ¶¶33, 72-76, Judge Subramanian credited Casey and Gomez's motives to receive one of the same stock awards for 2021 alleged in this case. ¶¶237-41. As Judge Subramanian noted, Dentsply "*just barely* hit the thresholds necessary for bonuses," by *two cents* of EPS. *San Antonio*, 732 F. Supp. 3d at 318. Both frauds were necessary to unlock that award, but the Byte fraud was more important. Casey and Gomez expected Byte to contribute five cents of EPS in 2021, while the channel stuffing fraud contributed only four. ¶239.

**Byte Was an Intense Focus for Defendants and Analysts**. Defendants claimed to know what they were talking about. Byte was discussed on every Dentsply conference call with investors during the Class Period. ¶218. Gunsagar and Casey both claimed to *personally* review Byte patient "feedback" *every day*. ¶219. As Dentsply's retrospective reports reveal, that feedback included a

---

[11] To be clear, the facts here allege "specific" compensation motives that are just as strong if not stronger than in *Set Cap.* and *New Link*. In *Set Cap.*, the bonus had "only limited weight" because it was purely "discretionary" and awarded "for the prior fiscal year" (before the class period). 996 F.3d at 82. Here, the bonuses were tied to objective thresholds and targets and awarded for the fiscal years during the Class Period when Dentsply's results were influenced by the fraud. In *New Link*, the district court held that scienter was alleged but dismissed the complaint for failure to allege falsity (as to certain statement) and loss causation (as to others). The Second Circuit reversed the dismissal *sub nom. Abramson*, 965 F.3d 165.

deluge of complaints of injury (*id.*), and also revealed the lack of dentist oversight and obvious contraindications. ¶¶108, 123-28. Campion, Coleman, and Frank also claimed to understand the reasons that Byte's conversion rate had improved after August 2022. ¶¶211-12, 219, 301-15. Campion and Coleman further claimed to know that Byte was hiring treatment planners (when it was really conducting mass layoffs). ¶¶355-57. Gunsagar (who was knowledgeable) reported up to Casey, Brackett (also knowledgeable) reported up to Frank then Campion, ¶¶38-39, and Casey and Gomez led the acquisition for Dentsply, ¶¶31-32—which facts further support Casey, Gomez, Campion, and Frank's professions of knowledge.

Knowledge is alleged when Defendants' "own statements detail the regular reports by which they would have learned" the misstated facts. *Ambac*, 693 F. Supp. 2d at 268. "Since these documents are identified in the defendants' own words, we do not require plaintiffs to provide additional detail about where defendants learned of facts contradicting their statements." *Id.* at 269; *see Set Cap.*, 996 F.3d at 80 & n.60 (defendant's public statement can "qualify as a 'specific document'" demonstrating defendant's knowledge); *San Antonio*, 732 F. Supp. 3d at 320 (plaintiff not required to "identify the specific document containing the contradiction" when "Defendants' own statements suggest they had access to—and reviewed—such information").

Casey, Campion, and Coleman made false oral statements about Byte in response to specific questions from analysts. ¶¶255, 259, 289, 299, 304-07, 310, 312, 314, 326, 355-57. Dentsply also issued false denials to a journalist and analyst investigating the uptick in Dentsply's MAUDE reports in 2024. ¶¶328-38. That "multiple analysts homed in" on Byte as "being key to [the company's] prospects" supports scienter. *Setzer*, 968 F.3d at 215; *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (that "analysts often inquired" gave Defendants "reason to focus"). Dentsply's "campaign . . . to placate the market in reaction to the

inquires by the media [and] analysts . . . provides cogent support for the inference of scienter." *comScore,* 268 F. Supp. 3d at 552. Under these circumstances, it is less likely Defendants were "simply ignorant," and being "ignorant is not necessarily exculpatory." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009).

### 2. The Complaint Alleges Dentsply's Corporate Scienter Based on Other Identified Officers Whose Scienter Should Be Imputed

Corporate scienter may be alleged by "pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015). Dentsply's motion does not dispute that the scienter of any Executive Defendant can be imputed to Dentsply. The Complaint alleges scienter as to each, and therefore as to Dentsply. The Complaint also alleges scienter by several specific corporate officers whose intent can be imputed to Dentsply.

The scienter of Dentsply's quality executives—including Emily Miner, Dentsply's Chief Quality Officer (May 2023 to present); Charles Pigott, Dentsply's Corporate VP, Quality and Regulatory (September 2007 to present), and Hannah Seevaratnam, Dentsply's VP, Corporate Quality Systems (October 2019 to May 2024), ¶¶131-32—can also be imputed to Dentsply. Dentsply *admits* (as it must) the Complaint alleges these quality executives "had direct access to patient complaints, bore the duty to personally review customer allegations of injury and to submit medical device reports to the FDA, and were the team responsible for overseeing quality system compliance worldwide." MTD at 8. Not only did the quality executives have access to the injuries, they knew Dentsply was required to report to the FDA any lost tooth; yet, they failed to report more than 100 lost teeth, plus more than 1,000 dead or fractured teeth. ¶¶133, 139-41. Dentsply

57

asserts the Complaint fails to allege scienter by "anyone whose knowledge can be imputed to the Company" (MTD at 19), but fails to explain why the quality executives lacked scienter or why their scienter cannot be imputed to Dentsply.

There is no "formulaic method or seniority prerequisite" for imputation, and officers at the C-level (Miner) and vice president-level (Pigott and Seevaratnam) are well within the category of "management-level," which is "generally sufficient." *BHP*, 276 F. Supp. 3d at 90. In *BHP*, this Court imputed to BHP the scienter of several officers within particular business units, including BHP's "Vice President of Finance for the Iron Ore business" and "vice president of Strategy and Development in its iron ore business." *Id.* at 74-75, 91. Here, Dentsply's quality executives operated at the corporate level and their role was not confined to any particular business or product unit, ¶¶131-32, further supporting imputation of their scienter. *See*, *e.g.*, *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363-64 (S.D.N.Y. 2012) (imputing scienter of "senior managers," including "vice president and assistant vice president"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442-43 (S.D.N.Y. 2005) (imputing scienter of "vice president of corporate finance" and "regional vice president"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (imputing scienter of "Vice President and a Managing Director").

The scienter of Byte's senior officers—including Tyler Stoker, Head of Sales and Business Development, Amber Medsker, Director of Clinical Support, and Mark McCrimmon, CTO—can also be imputed to Dentsply, including through the Byte subsidiary, which can be imputed to Dentsply. Stoker delivered the order to stop telling patients about contraindications. ¶¶113-16, 210-12. FE-2 warned Medsker that dentists were approving cases after less than two minutes of review. ¶99. And McCrimmon knew that Byte was auto-reassigning rejected cases to other dentists. ¶100. "[A] subsidiary's . . . scienter may be imputed to the parent company . . . ,

58

particularly where the subsidiary is at the center of the alleged fraud." *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. 2019).

### C.    Defendants' Scienter Arguments Are Meritless

In the face of these detailed allegations, Defendants ask the Court to infer that they were innocently ignorant about the lack of dentist oversight, targeting of contraindicated patients, and concealment of thousands of serious patient injuries. In doing so, they attempt to rewrite or ignore the facts alleged in the Complaint. Defendants' profession of ignorance is not credible and certainly not more compelling than the strong inference of scienter based on the facts alleged in the Complaint.

*First*, Defendants prematurely and improperly attempt to dispute factual allegations, which must be assumed true at this stage, even when comparing inferences of scienter. *See Tellabs*, 551 U.S. at 309. For example, Defendants attempt to deny, as "conclusory" (MTD at 17), the allegation that the accelerated targeting of contraindicated patients in August 2022 occurred with Campion and Frank's "knowledge and/or specific approval." ¶¶210-12, 221. But the Complaint alleges numerous facts demonstrating exactly why they had such knowledge, including, among other things, the timing of their appointment lines up with a major change in strategy, regarding a product Campion, Coleman, and Frank stressed as vital to the Company's recovery in the wake of the channel stuffing fraud; the change in strategy dramatically improved a metric for which Frank was responsible; and Campion, Coleman, and Frank all publicly touted this metric and the Company's work to improve it. ¶¶210-12. These facts, and the allegation that these Defendants knew about or approved a directive that numerous witnesses reported was approved by the "senior leadership" of the Company, must be accepted as true on this motion. ¶¶113, 116; *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 144 (S.D.N.Y. 2021) (factual allegation that CEO approved deals not "conclusory").

59

***Second***, Defendants argue the Complaint is required to "specifically identify the reports or statements containing" the contrary facts. MTD at 14; Casey MTD at 17; Gomez MTD at 14. It does, but that is not required in this context.

The allegation, for example, that Dentsply's top quality executive met once per quarter with the CEO to discuss injuries (¶¶131-32) specifies "who prepared internal company reports, how frequently the reports were prepared and who reviewed them." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73, 76 (2d Cir. 2001). Although the Complaint contains much more detail about concealed injuries, ¶¶135-51, there is no requirement to allege the exact ***content*** of each report with specificity. It is sufficient to combine allegations of a reporting mechanism with allegations of the true facts drawn from other sources. *EZCorp*, 181 F. Supp. 3d at 209 (defendants' recklessness with respect to violation of UK regulatory guidance for consumer lending by subsidiary supported by their receipt of monthly "Management Packs" that "contained information on 'internal control issues'"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*19 (S.D.N.Y. Mar. 25, 2013) (finding scienter based on "access to real time data," even though the court was "not privy to what the actual data revealed") (emphasis omitted); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604 U.S. 20 (2024) (scienter alleged where complaint alleged that executive had "access to detailed data" and, from other sources, what "sales data at the time ***would have shown***").[12]

*Novak*'s requirement to "specifically identify" is not the general rule, but is the second of four special rules applicable only to certain kinds of statements—namely, statements "consistent with reasonably available data":

---

[12] The Complaint's allegations of access are not "conclusory." Casey MTD at 19; Gomez MTD at 14. They are supported by factual allegations about Dentsply's quality databases and personnel, regular reporting, and the true facts about known injuries.

> Second, as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects. Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.

*Novak*, 216 F.3d at 309. This limitation is recognized. *Alstom*, 406 F. Supp. 2d at 460 n.21; *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *13 (S.D.N.Y. Sept. 6, 2005); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004). The rule does not apply to false statements of "historic fact." *Alstom,* 406 F. Supp. 2d at 460 n.21.[13]

There is no rule that "contradictory facts must be summarized in a single report that explicitly states the direct opposite of the misleading statement." *In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *14 (S.D.N.Y. Oct. 19, 2009). Defendants may be "made aware of the falsity of their statements by a number of reports, taken collectively." *Ambac*, 693 F. Supp. 2d at 267. Defendants' knowledge is alleged, for example, not just by the distillation of quality executives, but also by the underlying injury reports, ¶¶135-50, as well as numerous meetings in which a

---

[13] The only subsequent published Second Circuit decision to quote *Novak*'s "specifically identify" language, *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190 (2d Cir. 2008) (Gomez MTD at 14), is consistent with its limited scope. *Dynex* involved characterization of the causality of disclosed losses. Dynex stated the losses were caused by market conditions, while plaintiff alleged they should have attributed to loan origination practices. *Id.* at 196-97. Subsequent Second Circuit cases, including *Setzer*, 968 F.3d 204, state that scienter may be alleged based on access to information without stating this supposed additional requirement. *See id.* at 215. Defendants' remaining cited cases are not binding, do not discuss the context of *Novak*, and do not involve misstatements of historical fact. *See Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) (MTD at 14) (reasons for revenue growth); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510 (S.D.N.Y. 2009) (MTD at 15) (optimistic estimate of hurricane losses not yet noticed to the insurer); *In re Adient plc Sec. Litig.*, 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) (MTD at 16) (optimistic projections of future margin growth); *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) (MTD at 14) (technical accounting rule); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008) (MTD at 14-15) (reasons for disappointing performance of an acquired business unit).

61

named Dentsply senior executive instructed the sales force to sell to contraindicated patients, and in which management acknowledged Dentsply's failure to report injuries to the FDA and told employees not to speak to the FDA. ¶¶144, 176-78; *see Intuitive Surgical*, 65 F. Supp. 3d at 838 (scienter alleged with FE who "knew that [company] tracked adverse events" and that defendants "closely monitored these reports").

"[C]ontrary facts may also be learned in other ways, including through observation." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237 (S.D.N.Y. 2022). The facts that defendants saw with their own eyes while orchestrating the fraud cannot be ignored.

***Third***, Defendants wrongly argue that the Complaint's allegations about the importance of Byte are "nothing more than a core operations theory," which they say is called into question by the PSLRA and limited to operations of "nearly all" a defendant's business. MTD at 23-24. *Setzer*, a controlling Second Circuit post-PSLRA case, confirms that allegations of the "seriousness of the impact" support scienter—there, a misstatement about the creditworthiness of a tenant "representing seven percent of Omega's investment portfolio." 968 F.3d at 208.

Further, the core operations theory is valid and does not turn on formalistic percentages; it "simply reflects the commonsense assumption that executives are likely to know more about things central to their business." *San Antonio*, 732 F. Supp. 3d at 319-20. Commonsense says the Executive Defendants focused on Byte because it played a "key role in our portfolio," was a "bright spot[]," one of five "core strategic objectives," and the only product called out by name as a contributor to the Company's $3 EPS goal. ¶¶81-82, 86, 219. As part of the required holistic analysis, many courts in this Circuit have credited such inferences for operations less than nearly all a business. *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 853 (S.D.N.Y. 2019) (three parts of business—acquired Carmike theatres, AMC

loyalty program, and international operations—were each a "core operation" supporting scienter holistically); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 467-69 (S.D.N.Y. 2013) (executives' scienter as to NASDAQ's ability to execute post-IPO trading supported by core operations doctrine); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 319 (S.D.N.Y. 2013) (scienter as to failure to take valuation allowance of $119.4 million against U.S. deferred tax assets—as compared to firm's tens of billion in assets—supported executives' "duty to familiarize themselves with the facts relevant to the core operations"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 250-51 (S.D.N.Y. 2012) (scienter as to understatement of "effective income tax rate" by a "few percentage points" supported by core operations doctrine).

That Byte was a key product is not a "naked assertion." MTD at 25 (citing *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)). The Complaint alleges, among other supporting facts, Defendants' own words that Byte played a "key role," was a "bright spot," and was the key to $3 EPS—the only product named. ¶¶81-82, 86, 219.

*Fourth*, the cases cited by Defendants that involve adverse event reporting undermine Defendants' position. *In re Carter-Wallace Securities Litigation*, 220 F.3d 36 (2d Cir. 2000) (Casey MTD at 21), is abrogated by *Matrixx*, 563 U.S. 27. *Carter-Wallace* held that, to allege scienter for undisclosed adverse events, plaintiff must allege defendants' knowledge of a statistically significant safety issue. 220 F.3d at 40-42. That holding built upon the Court's prior holding that the omission of adverse events is immaterial unless "statistically significant." *In re Carter-Wallace Sec. Litig.*, 150 F.3d 153, 157 (2d Cir. 1998). *Matrixx* abrogated both holdings, finding falsity and scienter without statistical significance. Also, in *Carter-Wallace*, Defendants filed the adverse event reports with FDA (which at the time were not publicly available). Here,

63

Defendants deceived both FDA and investors. *Hou Liu v. Intercept Pharmaceuticals, Inc.*, 2020 WL 5441345 (S.D.N.Y. Sept. 9, 2020) (Casey MTD at 19; Gomez MTD at 13-14), is distinguishable because Intercept *did file* adverse event reports with the FDA, and those adverse event reports became public. "[T]he public availability of the SAE reports undermines an inference of scienter." *Id.* at *7 n.57. Here, the opposite inference should be drawn.

*Fifth*, Defendants' attacks on their own former employees are meritless. As described above, the FEs provide facts that support Defendants' deliberately illegal behavior and their knowledge and access to information. FE-2, a Senior Software Engineer, created the software that limited dentists' role to a four-click approval at the direction of Gunsagar and his direct reports and participated in meetings with Gunsagar where those limits were discussed. ¶¶97-101, 220. FE-7, a senior quality executive, describes Dentsply's quality policy (requiring all lost teeth to be reported to FDA) and the decades-long practice of a quality executive meeting quarterly with senior executives including the CEO. ¶¶130-33, 138, 213-15. FE-1, a treatment planner, describes how he and other non-dentists were forced to plan treatments without information necessary to identify contraindications; and that treatment planners were being fired when Campion and Coleman claimed to be hiring. ¶¶96, 158. FE-5 and FE-6, Byte salespersons, describe how they were ordered to push Byte on contraindicated patients. ¶¶113-16, 119. FE-3 and FE-4, Byte customer service representatives, explain how non-dentists on their teams directed patient care without any oversight from dentists. ¶¶104-07, 117, 119. FE-8, a records specialist, reports that management was aware of unreported injuries by at least 2023 and ordered employees not to speak to the FDA. ¶144.

These allegations satisfy the PSLRA because the former employees are "'described in the complaint with sufficient particularity to support the probability that a person in the position

occupied by the source would possess the information alleged.'" *Ambac*, 693 F. Supp. 2d at 268 n.31. FE-2 and FE-7 would understand software systems and compliance processes they helped create. The other FEs too were in a position to describe their own work and orders they and their colleagues received. The FEs' accounts are corroborated by each other, by a former patient (¶109), and by Dentsply's subsequent admissions, including in MAUDE reports.

Defendants disparage all but FE-7 as "low level," "rank-and-file," MTD at 3, 26-27; Casey MTD at 18-19, but there is no requirement that an FE have a particular level of seniority to report what they did, were ordered to do, and observed. *Lozada*, 710 F. Supp. 3d at 323-24 (crediting allegations from "low-level" FEs without "direct contact" with defendants); *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 262-63 (S.D.N.Y. 2023) (crediting allegations from "low-level" employees who "comprised a small fraction of the total employees"); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (FEs working in call centers "were positioned, albeit at low levels, to have knowledge of how Sallie Mae implemented its forbearance policy").[14] Defendants do not argue that FE-7 is "low level." *See* MTD at 26-27. FE-2 is not low level; he interacted with Gunsagar in a tight-knit, start-up environment.

Defendants object that FEs lacked "contact" and did not "raise . . . concerns" with Defendants. MTD at 3, 27-28; Casey MTD at 18-19. This is not required either, but in any event, not true—as FE-2 did have contact with Gunsagar. ¶220; *see EZCorp*, 181 F. Supp. 3d at 210

---

[14] *Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010) (MTD at 26), involved statements to the effect that American Express' aggregate credit quality was "strong" and loss reserves adequate. *Id.* at 453. The court found that plaintiff failed to allege those statements were contradicted by FE "anecdotes" about particular uncreditworthy borrowers. *Id.* at 455-57, 460. The aggregate could still be strong with some bad credits. Here, the allegations concern the most basic operational facts about the Byte business, such as whether patients were screened for contraindications and treatment overseen by dentists. The FEs do not just describe particular patients, but a system designed to push dangerous devices on contraindicated patients without dentist oversight.

(FE's "conference call discussion with [defendant] . . . qualifies as personal contact"); *see also In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 834 (S.D.N.Y. 2017) (FEs without contact with defendants sufficient to allege defendants "had access to information, or otherwise failed to check information, that would have indicated that their public statements were not accurate"); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615-16 (S.D.N.Y. 2015) ("no baseline requirement" of "contact" between FEs and defendants).[15]

Although FE-7 retired before Class Period, MTD at 28; Casey MTD at 21, there is a strong inference the established reporting mechanism described by FE-7 continued. ¶215. Keeping executive management informed continued to be required by law. ¶214. Casey touted Dentsply's Quality Assurance and Regulatory Affairs functions in the context of Byte. ¶61. In the unlikely event Casey or Campion cancelled meetings their predecessors took for years, their statements were reckless. *See Blanford*, 794 F.3d at 307 ("[A]llegations concerning activity in one period can support an inference of similar circumstances in a subsequent period."); *Scholastic*, 252 F.3d at 72 ("pre-class period information" regarding reporting mechanisms for book sales and returns show "what a defendant should have known during the class period"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (pre-class-period reports described by FEs "suggest that analogous information was available to Defendants during the Class Period").

---

[15] Defendants' cases are inapposite. *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323 (S.D.N.Y. 2009), and *In re Wachovia Equity Securities Litigation,* 753 F. Supp. 2d 326 (S.D.N.Y. 2011) (MTD at 27), involved subjective falsity of opinions undervaluing real estate and overvaluing securities, respectively. Here, the misstatements involve fact (or opinions actionable on grounds other than disbelief). *See supra* §III.B.2. *Compo* also involved a post-discovery posture where FEs had been deposed. 635 F. Supp. 2d at 330 n.54. *Adient* does not hold, as Defendants say (MTD at 16), that "meetings" are insufficient. In *Adient*, the statements were projections of future growth, and the facts cited to meetings were insufficient to contradict the projections. 2020 WL 1644018, at *17.

*Sixth*, Defendants' objections to the tone-at-the-top allegations fail. The Complaint does not merely "recycle" channel stuffing allegations. MTD 25-26. The Complaint properly alleges the facts of the channel stuffing as context for the Byte fraud—specifically, Casey and Gomez's motive to commit the Byte fraud and Campion, Coleman, Frank, and Brackett's motive to continue it. ¶¶7-9, 15, 33, 72-83, 86, 112, 212, 237-41. The fact of the channel stuffing is well supported by Dentsply's own admissions, which Judge Subramanian credited in sustaining the *San Antonio* complaint. *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214-15 (S.D.N.Y. 2019) (weight of authority shows "plaintiffs may base factual allegations on complaints from other proceedings"). Defendants' argument they cannot be liable unless they received specific "reports" of their own fraudulent scheme (MTD at 14; Casey MTD at 17; Gomez MTD at 14) is particularly problematic for a company with such a tone at the top.

Here, the Complaint provides a sufficient "link" (MTD at 26) between Dentsply's tone at the top to the Byte fraud. As described by the FEs, the Byte fraud involved employees in multiple departments being ordered to engage in wrongdoing: treatment planners ordered to plan without necessary records; salespeople ordered to deceive customers; customer service personnel ordered to play dentist; and records specialists ordered not to talk to the FDA. ¶¶96-97, 101-07, 144. Defendants' argument that the improper tone at the top set by Casey and Gomez was limited only to channel stuffing is unpersuasive and at best a disputed fact.

Gomez says these are "generalized 'culture' issues" that have nothing to do with him. Gomez MTD at 15. To the contrary, Dentsply's Audit Committee concluded he (and Casey) violated Dentsply's Code of Ethics and created the inappropriate tone and the top and the culture where employees feared retaliation. ¶¶78, 227.

67

*Seventh*, Defendants offer no relevant response to their duty to monitor. Defendants attempt to re-write these allegations to say that "Defendants must have been ***told*** of FDA issues" and respond to that strawman that the Complaint fails to "explain what specific quality issues management was ***informed*** of." MTD at 21; *see* Casey MTD at 23-24 (adopting same argument). Defendants' duty to monitor is a sufficient basis for scienter, separate and apart from Defendants' knowledge and access. *Blanford*, 794 F.3d at 306.

*Eighth*, Defendants wrongly attempt to recast their specific corporate and personal motives as "generic" ones that would apply to "virtually all" corporations and executives. MTD at 12-13; Casey MTD at 12-15; Gomez MTD at 10-12. But not every company is trying to break into a new multi-billion-dollar category; is struggling against headwinds that require two separate frauds to hit performance targets, and then the acceleration of one fraud after the other is discovered; or is motivated to conceal safety risks amidst an active lobbying campaign. At best, the purported genericness of those motives is a fact issue. Contrary to Defendants' assertion that all motives must be "personal," MTD at 13; Casey MTD at 13, the actionability of corporate motives is settled. *Set Cap.*, 996 F.3d at 81; *Sharette*, 127 F. Supp. 3d at 95-96.[16]

Defendants were motivated to conceal Byte's safety risks as part of their campaign to prevent states from banning DTC aligners. While legislation targeting DTC aligners was not ***passed*** until 2023, Casey MTD at 14 n.2, 23; Gomez MTD at 10, the safety of DTC aligners was an issue—and the motive to avoid regulation existed—throughout the Class Period. ¶¶51-52, 57-65, 153-55. That Dentsply was temporarily successful in averting legislation until after Casey, Gomez, and Gunsagar's departures underscores their motives. The Complaint alleges Dentsply

---

[16] *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197 (S.D.N.Y. 2012) (Buchwald, J.), rejected a corporate motive to "keep rigs running" because there was "no meaningful link" between the misstatements and the rigs running. *Id.* at 212 n.16. No personal motive was alleged.

lobbied for Byte throughout the Class Period. *E.g.*, ¶¶19, 152, 163, 217. Casey and Gomez's assertion otherwise (Casey MTD at 23; Gomez MTD at 10) is a disputed fact.

Regarding compensation, Casey concedes the controlling "direct link" standard, Casey MTD at 13 (quoting *ECA*, 553 F.3d at 201), while the other Defendants argue for a *per se* rule that no bonus can ever provide motive. MTD at 12-13; Gomez MTD at 10-11. Under controlling law, bonuses directly tied to specific performance metrics and that cross specific thresholds only because of the fraud can provide compelling motive. *Set Cap.*, 996 F.3d at 81;[17] *supra*, pp. 54-55 (additional cases). Allegations of bonuses tied to specific metrics and crossing specific minimum thresholds due to fraud are distinct from allegations of compensation tied to performance more generally.

In an effort to portray their bonuses as generic, Defendants attempt to re-write the allegations as "increased compensation *if Dentsply's stock price went up*." MTD at 2; *see ECA*, 553 F.3d at 198 ("desire to keep stock prices high to increase officer compensation" too generic) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)); *Novak*, 216 F.3d at 308 (motive "to keep the stock price artificially high" too generic). But the bonuses alleged here were tied to EPS and organic sales, *not* Dentsply's stock price. ¶¶236-47.[18]

---

[17] *Set Cap.* post-dates *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089 (S.D.N.Y. July 23, 2018) (Buchwald, J.), and *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498 (S.D.N.Y. 2020) (Buchwald, J.), MTD at 12-13, 24, 29; Casey MTD at 26. *Reilly* involved errors in applying complex accounting rules, but the facts relevant to those rules were disclosed. 2018 WL 3559089, at *2-4, *6-7. *Skechers* involved an alleged misstatement of a trend. Defendants did not receive bigger bonuses for misstating the trend. 444 F. Supp. 3d at 526. *Skechers* acknowledged bonuses can provide motive if an "extraordinary opportunity to reap financial benefits." *Id.* at 526-27.

[18] *Kalnit*, 264 F.3d 131, and *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453 (S.D.N.Y. 2019) (MTD at 12-14; Casey MTD at 13; Gomez MTD at 3, 11) did not involve bonuses tied to a specific metric or threshold only fraudulently achieved. *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471 (2d Cir. 2017) (Casey MTD at 11), involved discretionary bonuses and the award was not alleged to be tied to specific thresholds only fraudulently exceeded. *In re Take-Two*

Casey's argument that he did not expect Byte to be a "huge money-maker" in 2021 (Casey MTD at 14) is contradicted by the Complaint. Dentsply's guided that Byte would contribute $0.05 of EPS in 2021, which would have made the difference between Casey receiving $1.3 million or nothing. ¶¶238-39. Casey was ultimately deprived of that award only due to discovery of the channel stuffing. *Id.*

Casey and Gomez say their motive to receive awards for 2021 does not apply to the repetition of their statements in the 10-K filed March 1, 2022. Casey MTD at 13-14; Gomez MTD at 11-12. Casey and Gomez's channel stuffing fraud was then under investigation, ¶¶72-73, so it was not an opportune time for them to correct the record. Although Casey and Gomez did not receive incentive awards for 2022 as a result of their departures, "this argument confuses expected with realized benefits." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016). Gomez's offer letter from Moderna and Casey's termination post-date all their misstatements. ¶¶229-30. The suggestion that Casey and Gomez could have confessed their fraud in that 10-K without personal cost is at best a disputed fact.

The claim that Gunsagar and Brackett had no motive (MTD at 13) is misleading. Gunsagar received $19.6 million tied to an undisclosed Byte performance metric. ¶231. Brackett's compensation was likewise not disclosed.

Casey argues that the motive to continue and accelerate the Byte fraud after the channel stuffing fraud does not apply to him. Casey MTD 8, 14-15. True, but as discussed, Casey had a

---

*Interactive Securities Litigation*, 551 F. Supp. 2d 247, 294-95 (S.D.N.Y. 2008) (Gomez MTD at 3), held that motive was alleged—even though the number of options received was not tied to the fraud—because but-for the fraud "questions naturally would have arisen." Here, the Complaint alleges not just that questions would have arisen, but that Defendants would not have received their bonuses. *Thuman v. Dembski*, 2017 WL 3614522, at *6 (W.D.N.Y. Apr. 4, 2017) (Casey MTD at 3), is not a public company case, but a claim against an investment advisor receiving a fee he "could have expected from any similar investment."

different motive to begin the fraud others continued. Casey's argument again refutes Defendants' contention that these motives are generic.

These allegations of motive alone are sufficient for scienter, *Blanford*, 794 F.3d at 306, and the Court should also "assess the total weight of the circumstantial allegations together with the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137-38 (2d Cir. 2021).

***Ninth***, Defendants say their departures are unsuspicious because Dentsply's "announcements . . . did not link their departures to any finding that they had engaged in fraud." MTD at 23. There is no rule that a company must admit a departure is fraud-related (nor would such a rule make any sense).[19] The Complaint alleges a link based on the departures' timing, their seriatim nature, and the pretextual reasons stated or lack of explanation. ¶¶232-35; *supra*, p. 54. This is sufficient. *San Antonio*, 732 F. Supp. 3d at 321; *OSG*, 12 F. Supp. 3d at 632.

Defendants' attempt to rewrite the facts of their departures is unavailing. The Complaint does not "acknowledge[]" that Frank was truly eliminated in a restructuring. MTD at 23. Rather, that is what Dentsply "claimed," even though his was "the only officer's position eliminated." ¶233. Even by Defendants' telling, Dentsply was then taking "remedial steps," MTD at 8, which is a suspicious time for Brackett, Coleman, and Frank to depart.

Casey's termination and Gomez's resignation corroborate the allegations that they created Dentsply's inappropriate tone at the top. ¶¶78, 227-30. Their efforts to argue the facts of their departures, Casey MTD at 24-25; Gomez MTD at 13, are irrelevant and impermissible. The Audit Committee's supposed finding of "no evidence of intentional wrongdoing" regarding channel

---

[19] *BISYS*, 397 F. Supp. 2d at 446 (S.D.N.Y. 2005), and *Africa v. Jianpu Technology Inc.*, 2023 WL 5432282, at *8 (S.D.N.Y. Aug. 23, 2023) (MTD at 23; Casey MTD at 25; Gomez MTD at 3, 13), require facts linking departures to the fraud, not admissions.

stuffing, Casey MTD at 7, 9 & Casey.Ex. 1, is no basis for finding disputed facts now. That did not undermine the tone-at-the-top allegation in the channel stuffing case. *San Antonio*, 732 F. Supp. 3d at 320-21. Nor does it control here. Gomez did not resign only because of the channel stuffing, Gomez MTD at 13, but because he "was culpable in *two* frauds." ¶229.[20]

*Tenth*, unable to dispute that the order to stop informing patients of contraindications strongly supports scienter, Dentsply wrongly argues that Stoker's scienter cannot be imputed because he did not "craft[] or review[]" the misstatements. MTD at 16 (quoting *Jackson*, 960 F.3d at 99). The quoted language in *Jackson* is not the standard for imputing the knowledge of an identified individual, such as Stoker (or Dentsply's quality executives and the other Byte officers, whose imputation Dentsply ignores), but rather for alleging "*collective* corporate scienter" based on the scienter of "*unidentified* senior executives." *Id.* at 97-99.[21] When imputing the scienter of an identified officer, "the individual making an alleged misstatement and the one with scienter do *not* have to be one and the same." *BHP*, 276 F. Supp. 3d at 90.

*Eleventh*, Defendants attempt to characterize the use of Dentsply's retrospective MAUDE reports as "fraud by hindsight," arguing that these injuries were only "later determined to be reportable." MTD at 21. "[T]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In*

---

[20] Gomez quibbles with whether he resigned or was terminated. Gomez MTD at 3, 13. He resigned from Dentsply while under investigation and then was terminated by Moderna when they learned of his conduct at Dentsply. ¶229.

[21] Prior to the quoted paragraph, the Second Circuit rejected plaintiff's arguments regarding identified individuals on other grounds. As to individual defendant Falk, Jackson was bound by his choice "not to appeal the district court's determination that the proposed amended complaint did not raise a strong inference that Falk acted with scienter." *Jackson*, 960 F.3d at 97. As to the "three employees who testified in the California Action," the Court held that they lacked scienter (not that their scienter could not be imputed). *Id.* at 99.

72

*re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 504 (S.D.N.Y. 2011) (collecting cases). In the MAUDE reports, Dentsply admitted that it was aware of the injuries on earlier dates during the Class Period. ¶138 n.8. Defendants' assertion that these injuries were not contemporaneously "determined to be reportable" is a disputed extrinsic fact that is contrary to the Complaint's extensive allegations about Dentsply's quality policies, former employee accounts, and investigative journalist reports. ¶¶133, 140, 144, 147. None of this is "hindsight."[22]

*Twelfth*, Defendants' proposed competing inference that they simply "did not know" (MTD at 28), or lacked "any knowledge" of Dentsply's Byte misconduct (Casey MTD at 25; Gomez MTD at 15), ignores the Complaint and fails badly. This purported inference fails to "tak[e] the facts in the light most favorable to the plaintiffs." *Ambac*, 693 F. Supp. 2d at 269. Defendants' profession of ignorance is directly contrary to the Complaint's factual allegations regarding their direct involvement in the scheme, the sources of information available to them, and that they claimed to review. *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 2023 WL 6393865, at *15 (S.D.N.Y. Sept. 29, 2023) (rejecting proposed inference "in direct contravention of [p]laintiff's factual allegation"); *MF Glob.*, 982 F. Supp. 2d at 320-21 (proposed inference of "genuine belief" raises fact dispute).

Defendants' purported ignorance is not even exculpatory in light of their duty to monitor and the nature of their statements, which represented that they had knowledge. *San Antonio*, 732 F. Supp. 3d at 322 (rejecting inference that Casey and Gomez were "blissfully unaware" of channel

---

[22] *Insperity* (MTD at 21) is inapposite because it involved "guidance," "targets," predictions about "liability and expense estimates," and statements about whether the company was "on track" with the same—in other words, statements in which a "fraud by hindsight" defense might apply. *Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity, Inc.*, 2022 WL 784017, at *2-5 (S.D.N.Y. Mar. 15, 2022) (Buchwald, J.).

stuffing and noting that "even if they simply turned a blind eye to all the red flags, willful blindness is also enough"); *Avaya,* 564 F.3d at 270 & n.43 (being "ignorant is not necessarily exculpatory"). Nor do Defendants in any way account for the other circumstances, including the serious impact of their statements, their motives, or the mid-2024 departures.

The improper factual assertion that "Defendants worked assiduously to complete all required reporting," (MTD at 1) makes no sense because Dentsply continued retrospective reporting after their departures. ¶¶144-45, 203-08. Moreover, the assertion that Defendants remediated the FDA injury reporting is inconsistent with their claim that it was not their responsibility.

The suggestion that Defendants could have known about Byte patient injuries, but somehow not that they were unreported or required to be reported (MTD at 19-20), is also implausible and not exculpatory. During each Defendant's tenure, hundreds to thousands of serious patient injuries were unreported, and the vast majority of all Byte injuries were unreported. ¶137. Given their obligations under the FDA's Quality System Regulation, it would have been grossly reckless for Defendants to learn of that many injuries without, at minimum, ensuring that they were being reported. ¶¶151, 322. Casey's observation that there were only "746" serious patient injuries suppressed during his tenure (*see* Casey MTD at 23) is not exculpatory either.

While the inference of scienter is much stronger than any competing inference proposed by Defendants, if competing inferences are equal, "the tie . . . goes to the plaintiff." *In re Salix Pharm, Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

***Last***, the Complaint does not "clump" all the Defendants together but specifically and sufficiently alleges scienter as to each Defendant. MTD at 11, 16 (citing *Aegean*, 529 F. Supp. 3d

74

at 147). Specifically, as summarized *supra* §IV.B.1, the Complaint alleges each Defendants' role in the fraud, and makes clear the circumstances supporting each Defendants' scienter.

Casey and Gomez's arguments that the lack of dentist oversight, sales to contraindicated patients, and concealed injuries were not issues during their tenures (Casey MTD at 8, 16; Gomez MTD at 12) are incorrect. The lack of dental oversight predates the acquisition. ¶¶97-101. Dentsply has "no effective process" to exclude contraindicated patients throughout the Class Period. ¶¶96, 111. There were unreported injuries throughout the Class Period, ¶¶137, 145, and additional injuries from the beginning of the Class Period remain unreported. ¶148. On these facts, "it is plausible that the misconduct stretched through the Class Period." *comScore*, 268 F. Supp. 3d at 551. Casey and Gomez learned the true facts during the acquisition, ¶¶31-32, 218, and Casey further learned them when he read Byte patient feedback daily, ¶219, and when he was briefed quarterly on injuries. ¶¶132-33, 214-15. Casey's scienter further supports Gomez's scienter, given their long history together, committing prior securities frauds together both at Dentsply and their prior employer. ¶¶31-33; *see Ambac*, 693 F. Supp. 2d at 268 (it "strains credulity that [a CFO] could remain ignorant of [misstated facts] while the CEO and other senior managers were aware of them."). Casey's proposed inference that he "genuinely believed in the pre-acquisition image put forth by Byte in its public relations campaign," Casey MTD at 20, simply disputes facts.

Brackett and Frank dispute their scienter as to their statements that they reviewed and approved Dentsply's quality system and its compliance with FDA QSR 820 in the Sustainability Report for 2022. MTD at 19-20; *see* ¶¶340, 342, 344. But both were members of "management with executive responsibility" and thus had a duty to monitor Dentsply's quality system and compliance with QSR 820. ¶¶17, 37, 39, 316-25. Brackett was the Head of Sustainability and Chair of the ESG Steering Committee and Frank, her supervisor, was a member of the Extended ESG

75

Steering Committee; that committee's purview (as demonstrated by the Sustainability Reports) includes QSR compliance. ¶¶37, 39, 221. Brackett, as SVP responsible for the Byte business, personally reviewed patient complaints of injury, at least 3,959 of which were suppressed during her tenure. ¶¶131, 137-38. Frank participated in all major decisions affecting Byte and had a personal financial motive to conceal injuries, at least 5,849 of which were concealed during his tenure. ¶¶37, 39, 137, 221, 242-74. Brackett and Frank both suspiciously departed just prior to Dentsply's spike in reporting. ¶¶232-33, 235. These allegations suffice.

## V.      THE COMPLAINT ALLEGES A SCHEME CLAIM

Defendants also violated Rule 10b-5(a) and (c), which make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). To state a claim under these provisions, plaintiff must allege defendant "(1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries." *ForceField*, 2017 WL 1319802, at *7 (emphasis omitted). The PSLRA's heightened pleading standard, 15 U.S.C. § 78u-4(b)(1), does not apply to scheme claims. *SEC v. Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022).

"These provisions capture a wide range of conduct," including "conduct involving false or misleading statements." *Lorenzo v. SEC*, 587 U.S. 71, 79-81 (2019). Misstatements cannot be the "sole basis" for scheme liability; there must be "something beyond," such as "dissemination" (as in *Lorenzo*) or possibly "corruption of an auditing process" or "allegations that a corporate officer concealed information from auditors." *Rio Tinto*, 41 F.4th at 53-54.

The Complaint alleges that Defendants engaged in a fraudulent scheme involving both misstatements directed toward investors and deceptive conduct that created a false impression on which investors relied. ¶¶387-97. The deceptive conduct includes:

- Systematically failing to report thousands of serious injuries to the FDA, despite being required to report them by law, including by specifically instructing sales employees to not discuss Byte with the FDA without management present (¶144), which had the effect of deceiving both the FDA and others, including investors, who rely upon the FDA's MAUDE database. ¶¶134-52, 391(i). This created the false impression that Byte had a near perfect safety record prior to September 2024, ¶144, when in reality, there were dozens to hundreds of concealed serious injuries nearly every month. ¶145.

- Engaging in deceptive lobbying that relied on Byte's false safety profile as portrayed in the MAUDE database, including behind closed doors, which prevented or else delayed legislation and rulemaking to address the safety risks of DTC aligners like Byte, further concealing Byte's true risks from regulators, lawmakers and investors. ¶¶173-79, 391(ii).

- Using NDAs to silence injured patients, which prevented injured patients from warning the public, including investors, about their true experience, including the injuries they suffered, Dentsply's refusal to connect the dentists purportedly overseeing their treatment, and the contraindications of which they informed Dentsply only to receive false reassurance. ¶¶153-55, 391(iv).

- Systematically misleading patients about contraindications, thus inflating Byte's sales and conversion rate, which had the effect of deceiving investors into believing that Byte had the ability to grow sales while adhering to its patient standards. ¶¶110-17, 391(v).

This is precisely the type of conduct that is actionable under Rule 10b-5(a) and (c). The "failure . . . to make required disclosures" in regulatory filings is conduct that "signals falsely to investors that there is no such [information] to disclose" and amounts to "something extra" beyond misstatements alone. *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 418, 420-21 (S.D.N.Y. Mar. 28, 2025) (failure to file Schedule 13D); *see Able Lab'ys*, 2008 WL 1967509, at *20 (sustaining scheme claim based on defendant "failing to report adverse drug events to the FDA").

Courts have also approved scheme claims based upon deception directed at parties in addition to investors—such as the FDA, legislators and regulators, and patients—where the deception of the third party prevents the truth from reaching investors. *See Rio Tinto*, 41 F.4th at 53-54 (hypothetical involving deception of auditor); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) (deception of public and medical community by manipulating clinical studies published by third parties in medical journals); *In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *8 (W.D. Pa. July 8, 2025) (deception of FDA, including with "cooked" data); *Klein v. Altria Grp. Inc.*, 525 F. Supp. 3d 638, 665 (E.D. Va. 2021) (sustaining scheme claims where defendants "deceive[d] the FDA into not regulating mint"); *Able Lab'ys*, 2008 WL 1967509, at *20 (deception of FDA with falsified quality control data).

The Complaint alleges scienter for the scheme claim for substantially the same reasons already discussed *supra* §IV, including: Defendants' knowledge and access to information about patient injuries and contraindications; Defendants' duty to monitor patient injuries as members of management with executive responsibility; Campion and Frank's knowledge and approval of the directive not to inform patients of contraindications; and the involvement of executives (including Campion) in Dentsply's lobbying. ¶217. Moreover, as part of the scheme to conceal, Dentsply management prohibited employees from speaking to the FDA. ¶144.

Because Defendants' scheme involved both misstatements and deceptive conduct, Defendants' objection that it is based solely on misstatements fails. MTD at 36; Casey MTD 30, Gomez MTD at 17-18. Unlike the Complaint in *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) (MTD at 36; Gomez MTD at 17-18; Casey MTD at 30), which merely "rest[ed] upon the incorporation of the previous 140 pages," the Complaint contains an "enumeration of which specific acts" that furthered the scheme. *Id.* at 105.

78

Defendants Casey and Gomez say, without explanation, that the Complaint fails to plead reliance for the scheme claim (Casey MTD at 30; Gomez MTD at 18), but the Complaint plausibly alleges that reliance can be presumed. ¶¶375-77. The Complaint further alleges, for example, that investors and analysts rely upon injury reports (or their absence) in the MAUDE database. ¶¶18-20, 152, 173, 320, 337. Plaintiffs are not required to allege that the scheme's "deceptive acts" were "publicly known" (an oxymoron); only that Defendants succeeded in making the result of their deception, *i.e.*, the "public-facing cover," known. *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *19-21 (M.D. Tenn. Feb. 24, 2023); *see In re DiDi Glob. Inc. Sec. Litig.*, 2025 WL 1909295, at *16 (S.D.N.Y. July 7, 2025) ("[C]ourts have held that a scheme claim may be based on non-public misrepresentations made to induce action by others . . . . Because this theory of liability is premised on an omission, *Affiliated Ute* applies and reliance is presumed class-wide."), *report and recommendation adopted*, 2025 WL 2345696 (S.D.N.Y. Aug. 13, 2025); *Yoshikawa v. Exxon Mobil Corp.*, 2024 WL 3802997, at *6 (N.D. Tex. Aug. 12, 2024) (presumption of reliance appropriate when scheme results in omission that "reasonable investor may have considered . . . important"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1197-99 (D. Or. 2015) (fraud-on-the-market presumption appropriate for scheme claims where conduct is "sufficiently connected to the information released to the public").

Casey and Gomez also argue that they committed no deceptive acts. Casey MTD at 30; Gomez MTD at 18. That is wrong. The Complaint plausibly alleges that both played a key role in orchestrating the scheme, including by leading the acquisition. *Supra*, p. 52; *see ForceField*, 2017 WL 1319802, at *10 ("[I]t is reasonable to infer that [CFO] was also involved in the scheme."). Further, as members of management with executive responsibility, both are responsible for

hundreds of acts of concealment of injuries that should have been reported to the FDA. ¶¶17, 132, 135, 137, 214-15, 321-22, 391(i); *Able Lab'ys*, 2008 WL 1967509, at *21.

*Stoneridge Investment Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008) (Gomez MTD at 18), held that the fraud-on-the-market presumption did not apply to scheme claims against defendants who were third-party suppliers of the issuer because their acts were "too remote." *Id.* at 149. "It was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." *Id.* That reasoning does not apply to a scheme perpetrated by an issuer's senior executives, as here. *See AAC Holdings, Inc.*, 2023 WL 2592134, at *19 ("*Stoneridge* generally has relatively little … to say about the applicability of the *Basic* presumption" to ordinary claims against insiders); *Galena*, 117 F. Supp. 3d at 1197-99 (distinguishing *Stoneridge*).

## VI.    THE COMPLAINT SUFFICIENTLY ALLEGES CONTROL CLAIMS UNDER SECTION 20(a)

The Complaint sufficiently alleges predicate violation, described above, as well as control by each Executive Defendant. *See ForceField*, 2017 WL 1319802, at *16; 17 C.F.R. § 240.12b-2 (defining control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person"). Control "need not be pleaded with particularity." *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006). "Whether a person is a 'controlling person' is a fact-intensive inquiry" that "generally should not be resolved on a motion to dismiss." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).

Defendants Casey and Campion served as Dentsply's CEO, and Defendants Coleman and Gomez as its CFO; all were signatories of Dentsply's 10-Ks and 10-Qs and regularly spoke directly to analysts and investors about Byte during their tenures. ¶¶31-32, 34-35. Casey and Gomez also

80

personally led the Byte acquisition. ¶¶31-32. "[T]here is no question that they 'controlled'" Dentsply. *ForceField*, 2017 WL 1319802, at *17; *see Aegean*, 529 F. Supp. 3d at 175 (CFO "exerted significant control" because he "reviewed the company's financials, and made statements on behalf of Aegean in public filings"); *Ambac*, 693 F. Supp. 2d at 274 (control person claim sustained against CEO and CFO who "participated in writing or reviewing" alleged misstatements and who "because of their executive positions … were able to control the conduct of Ambac's business, the information contained in its SEC filings and public statements about its business").[23]

Defendants Frank, Gunsagar, and Brackett also exercised control by virtue of their "high-level positions" and "direct and supervisory involvement in the day-to-day operations" of the business unit at the heart of the fraud. *Cornwell*, 689 F. Supp. 2d at 639. Defendant Frank, as EVP, Product Team then EVP, Chief Business Officer, directly supervised the head of the Byte business, was responsible for overseeing Byte's fraudulently-inflated "customer conversion rates," knew or approved the decision to stop informing patients of contraindications, and spoke directly to analysts and investors about Byte. ¶¶37, 210, 221. Gunsagar was CEO of the Byte subsidiary, directed and enforced Byte's policies limiting the role of dentists, and also spoke directly to analysts and investors. ¶¶38, 220. Brackett was SVP, Orthodontic Aligner Solutions and Customer Experience (the business unit for Byte) and Head of Sustainability from April 2023 to early September 2024; she chaired the committee that drafted and approved the misleading 2022 "Sustainability Report." ¶39. Each was also a member of management with executive

---

[23] *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148 (S.D.N.Y. 2008) (Casey MTD 31; Gomez MTD 19), is not otherwise. It held that the CEO "was clearly in a position to exercise control" based on his office, plus his role as "signor and speaker," and that an SVP also exercised control based on his "very high-level executive positions" and his role negotiating a relevant agreement. *Bristol Myers*, 586 F. Supp. 2d at 171.

81

responsibility, with a duty to monitor Dentsply's quality system. ¶¶17, 132, 135, 137, 214-15, 321-22. These allegations also demonstrate control.[24]

The Complaint sufficiently alleges each Executive Defendant "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). Because scienter is alleged as to each, culpable participation "has been adequately pled as well." *Aegean*, 529 F. Supp. 3d at 174; *see Ambac*, 693 F. Supp. 2d at 274 (culpable participation pled because CEO and CFO "participated with scienter in the primary violation"). In the alternative, because Section 20(a) makes good faith an affirmative defense, culpable participation can be pled without scienter. *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *15 (S.D.N.Y. June 28, 2010).

## VII.    CONCLUSION

For the reasons set forth herein, Lead Plaintiffs respectfully request that Defendants' motions to dismiss be denied in their entirety.[25]

---

[24] *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) (MTD at 37), dismissed control person claims against two minority shareholders (Microsoft and Softbank) who were each entitled to appoint "one outside director to a twelve-director board." *Id.* at *13. It says nothing about the control of officers like the Executive Defendants.

[25] To the extent the Court grants any part of Defendants' motions, Lead Plaintiffs respectfully request leave to amend in order to incorporate additional information to further bolster their allegations of falsity and scienter, and which was obtained only after the filing of the Complaint, including from (i) additional confidential witnesses; (ii) additional FOIA and similar public access requests to relevant government agencies; and (iii) additional injuries belatedly reported to the FDA. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 462 (S.D.N.Y. 2014) (Buchwald, J.) (granting plaintiffs leave to amend when they had attempted to plead a certain theory "just once before," given Rule 15(a)'s "broad grant of discretion").

Dated: September 8, 2025

/s/ Michael D. Blatchley
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Salvatore J. Graziano
Hannah Ross
Michael D. Blatchley
Scott R. Foglietta
Shane D. Avidan
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
salvatore@blbglaw.com
hannah@blbglaw.com
michaelb@blbglaw.com
scott.foglietta@blbglaw.com
shane.avidan@blbglaw.com

*Counsel for Lead Plaintiffs HANSAINVEST
Hanseatische Investment- Gesellschaft mit
beschränkter Haftung and City of Miami
General Employees' & Sanitation Employees'
Retirement Trust and Lead Counsel for the
Class*

**KLAUSNER, KAUFMAN, JENSEN
& LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Miami General
Employees' & Sanitation Employees'
Retirement Trust*

83

## CERTIFICATE OF COMPLIANCE

On July 7, 2025, the Court granted Defendants' request for an extension of the default word limitations for their motions to dismiss from 8,750 words to 12,250 words, and permitted Plaintiffs to file a responsive brief that equaled the aggregate number of words in Defendants' briefs. On July 8, 2025, Defendants Dentsply, Campion, Coleman, Frank, Brackett, and Gunsagar filed a brief consisting of 12,191 words, Defendant Casey filed a brief consisting of 8,727 words, and Defendant Gomez filed a brief consisting of 6,168 words. In total, Defendants filed briefs with a total word count of 27,086.

I, Michael D. Blatchley, certify that Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss complies with the "word limit equal to the aggregate word count of all briefs . . . filed by Defendants" in accordance with this Court's July 7, 2025 Order because it consists of 26,563 words excluding parts of the document exempted by Rule 7.1(c) of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York.

/s/ Michael D. Blatchley
Michael D. Blatchley