# Exhibit A

2025 WL 2825369
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Jesse SHERMAN, Arlette Sherman,
Lead Plaintiffs-Appellants,
PAMCAH-UA Local 675
Pension Fund, Movant-Appellant,
Michael Francisco, Individually and on Behalf
of All Others Similarly Situated, Plaintiff,
Daniel LaMoureaux, Individually and on Behalf of
All Others Similarly Situated, Consolidated Plaintiff,
v.
ABENGOA, S.A., Manuel Sanchez Ortega, Canaccord
Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch
International, Société Générale, Defendants-Appellees,
Santiago Seage, Barbara Zubiria, Ignacio Garcia
Alvear, Alicia Velarde Valiente, Banco Santander, S.A.,
Carlos Sundheim Losada, Christopher Hansmeyer,
Claudi Santiago Ponsa, Enrique Borrajo Lovera, Felipe
Benjumea Llorente, Fernando Solis Martinez-Campos,
Ignacio Solis Guardiola, Javier Benjumea Llorente,
Jesus Garcia-Quilez Gomez, Jose B. Terceiro, Jose
Borrell Fontelles, Jose Joaquin Abaurre Llorente,
Jose Luis Aya Abaurre, Maria Teresa Benjumea
Llorente, Ricardo Martinez Rico, Defendants.

No. 22-2438
|
August Term 2023
|
Argued: March 1, 2024
|
Decided: October 6, 2025

**Synopsis**
**Background:** Investors filed second amended complaint bringing putative class action against foreign engineering company, company's former CEO, and underwriters, asserting claims under the Securities Act and the Securities Exchange Act in connection with American depositary shares (ADS) that were purchased pursuant to company's public offering. The United States District Court for the Southern District of New York, Edgardo Ramos, J., 481 F.Supp.3d 179, granted defendants' motions to dismiss for failure to state a claim, and then, 559 F.Supp.3d 286, granted in part and denied in part investors' motion for leave to file third amended

complaint. Thereafter, defendants filed motion to dismiss for failure to state a claim, which the district court, 624 F.Supp.3d 365, granted, and dismissed third amended complaint with prejudice. Investors appealed.

**Holdings:** The Court of Appeals, Sullivan, Circuit Judge, held that:

third amended complaint related back to investors' first amended complaint;

statements that company "enforce[d] strict financial discipline" through "robust project management and control system" were non-actionable puffery;

district court erred by disregarding allegations made by confidential witnesses;

district court erred by disregarding reports and allegations from criminal proceedings brought against company in Spain;

investors plausibly alleged that company's statements claiming to adhere to its revenue-calculation method were false, as required to state claim for violation of the Securities Act;

vacatur of judgment granting motion to dismiss for failure to state claim as to claims for securities fraud under § 10(b) and Rule 10b-5 was warranted; but

investors did not state claim against company's former CEO for control-person liability under Act.

Affirmed in part, reversed in part, and vacated in part.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

Appeal from the United States District Court for the Southern District of New York No. 15-cv-6279, Edgardo Ramos, *Judge*.

**Attorneys and Law Firms**

Andrew S. Love, Robbins Geller Rudman & Dowd LLP, San Francisco, CA (Robert M. Rothman, Erin W. Boardman, Robert D. Gerson, Robbins Geller Rudman & Dowd LLP, Melville, NY; Nicholas I. Porritt, Adam M. Apton, Levi &

Korsinsky, LLP, New York, NY, on the brief), for Plaintiffs-Appellants and Movant-Appellant.

Jeffrey D. Rotenberg, Clark Smith Villazor LLP, New York, NY (Richard F. Hans, Marc A. Silverman, DLA Piper LLP, New York, NY, on the brief), for Defendant-Appellee Abengoa, S.A.

Stephen A. Radin (Ben Marcu, Liz Grefrath, on the brief), Weil, Gotshal & Manges LLP, New York, NY, for Defendant-Appellee Manuel Sanchez Ortega.

Kannon K. Shanmugam, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC (Abigail Frisch Vice, E. Garrett West, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Richard Rosen, Patrick McCusker, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, on the brief), for Defendants-Appellees Canaccord Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch International, and Societe Generale.

Before: Livingston, Chief Judge, Sullivan, and Menashi, Circuit Judges.

**Opinion**

Richard J. Sullivan, Circuit Judge:

 **\*1** Plaintiffs Jesse Sherman, Arlette Sherman, and PAMCAH-UA Local 675 Pension Fund – representatives of a class of investors who purchased American Depository Shares ("ADSs") in Abengoa, S.A. ("Abengoa") – appeal from a judgment of the United States District Court for the Southern District of New York (Ramos, *J.*) dismissing their claims under sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5. Plaintiffs principally alleged that Abengoa manipulated its financial records to conceal the company's liquidity crisis, thereby contributing to the firm's bankruptcy.

We conclude that the district court erred in dismissing Plaintiffs' Securities Act claims on the grounds that they were untimely and, alternatively, failed to state a claim. Specifically, we hold that Plaintiffs' claims were filed within the one-year statute of limitations. We also hold that the district court failed to credit Plaintiffs' allegations from confidential witnesses and from Spanish criminal proceedings, which gave rise to the plausible inference that Defendants violated section 11. To the extent that our prior case law is ambiguous, we clarify that a complaint may rely on factual allegations or reports incorporated in complaints from other proceedings, subject, of course, to the limitations of Federal Rule of Civil Procedure 11. While this is inherently a case-specific inquiry that will turn on the nature and substance of the allegations made in the other proceedings, the allegations relied on by Plaintiffs here were detailed, independently corroborated, and the product of an independent investigation, which distinguishes them from those of our prior precedents in which we rejected pleadings that merely relied on conclusory allegations asserted in other proceedings.

We likewise conclude that the district court erred in dismissing Plaintiffs' Exchange Act claims against Abengoa, which was based on its refusal to consider the allegations from the confidential witnesses and Spanish proceedings; we therefore vacate that dismissal. Nevertheless, we hold that the district court properly denied Plaintiffs leave to assert Exchange Act claims against Abengoa's former CEO, Manuel Sanchez Ortega, because such claims would have been futile. Accordingly, we AFFIRM in part, REVERSE in part, and VACATE in part the judgment of the district court.

## I. BACKGROUND

Plaintiffs' cause of action stems from Abengoa's initial public offering of ADSs on the NASDAQ Global Select Market (the "NASDAQ") on October 17, 2013. As relevant to this appeal, Abengoa was an engineering and construction company founded in 1941 and headquartered in Spain. Abengoa consisted of 532 subsidiary companies, seventeen associated companies, and thirty-four joint ventures that operated in over seventy countries around the world. Abengoa's business was divided into three core areas: (1) Engineering and Construction, (2) Infrastructure Concessions, and (3) Industrial Production. The Engineering and Construction group was led by Abengoa's subsidiary, Abeinsa Ingeniería y Construcción Industrial S.A. ("Abeinsa"), which controlled all of Abengoa's operations in the United States, Mexico, Argentina, Uruguay, Chile, and Brazil between 2013 and 2015. Within the Engineering and Construction group, another subsidiary, Instalaciones Inabensa S.A. ("Inabensa"), focused on electrical and mechanical infrastructure as well as instrumentation for use in the energy and transport sectors. In total, the Engineering and Construction Group accounted for over sixty percent of Abengoa's annual sales.

**\*2**  Abengoa determined its gross operating margin by subtracting its operating costs from its sales to determine the company's earnings before interest, taxes, depreciation, and amortization. Gross operating margin is a metric frequently used by analysts, investors, and the general public to monitor the financial health of a business. Given the large number of projects that Abengoa carried out around the world, it was required to track the progress and costs of each project so that it could accurately determine the firm's earnings on a monthly, quarterly, and annual basis. Under the International Accounting Standards that are applicable to construction projects, "income equal[s] the costs incurred on the project plus a pro-rated amount of the profit or operating margin that will ultimately be recognized on the project." J. App'x at 905. When the outcome of a construction contract can be estimated reliably, contract revenues and expenses are to be "recognized by reference to the stage of completion of a contract." *Id.* But when such estimation is not possible, "revenue is recognized only to the extent of recoverable contract costs [actually] incurred." *Id.* Abengoa referred to this accounting procedure as the " 'percentage of completion' method." *Id.*

On October 4, 2013, in preparation for the initial public offering of its ADSs on the NASDAQ, Abengoa filed a Registration Statement with the SEC on Form F-1. Canaccord Genuity Inc., HSBC Securities (USA) Inc., Merrill Lynch International, and Société Générale (together, the "Underwriter Defendants") helped to prepare and disseminate this Registration Statement, and Sanchez Ortega signed the document. As relevant to this case, the Registration Statement represented that Abengoa had "successfully grown [its] business while seeking to enforce strict financial discipline to maintain [its] strong liquidity position." *Id.* at 942 (emphasis omitted). The Registration Statement further represented that "[r]evenue from construction contracts is recognized using the percentage-of-completion method for contracts whose outcome can be reliably estimated and it is probable that they will be profitable"; it also provided details on how Abengoa would calculate the percentage of completion. *Id.* (emphasis omitted). Specifically, the Registration Statement emphasized that Abengoa would only "rely on objective data such as physical inspections or third parties['] confirmations" and that costs "which relate to future project activities are not included when determining the percentage of completion." *Id.* at 942–43 (emphases omitted).

In September 2014, Abengoa announced that it was "transitioning to an 'asset-light' business model" that was "aimed at generating cash throughout the lifecycle of construction projects." *Id.* at 928. As part of this transition, Abengoa created a subsidiary called Abengoa Greenfield, S.A., which issued €500 million in bonds (the "Greenfield Bonds") that the company announced would be classified as corporate recourse debt. In November 2014, Abengoa reported its financial results, which prompted questions from investment analysts, who noted that the Greenfield Bonds did not appear to be included in Abengoa's corporate leverage ratio. Abengoa later revealed that – contrary to its prior representations – it had classified the Greenfield Bonds as non-recourse debt. In light of this admission, the price of the Abengoa ADSs tumbled nearly fifty percent over the next three trading days.

Despite these developments, Abengoa continued to report healthy liquidity levels and positive cash flow throughout 2015. On May 19, 2015, Sanchez Ortega resigned from his position as CEO of Abengoa. Then, during a conference call with analysts and investors on July 31, 2015, Abengoa first suggested that it might be experiencing financial difficulties, though it reassured those on the call that the company had "no plan ... to tap the capital markets in any manner." *Id.* at 987 (emphasis omitted) (internal quotation marks omitted). Nevertheless, the very next business day, Abengoa sought shareholder approval of a capital increase to "reduce corporate debt" and "reinforce [its] balance sheet," a move that "stunned" investors because it indicated that Abengoa's "liquidity position was in jeopardy." *Id.* (internal quotation marks omitted). The price of Abengoa's ADSs again plummeted, falling more than forty-five percent in a two-day period. Approximately four months later, on November 25, 2015, Abengoa announced that it was filing for preliminary creditor protection under the Spanish Insolvency Law. Over the ensuing months, dozens of Abengoa's affiliates based in the United States filed for Chapter 11 bankruptcy protection, and Abengoa itself ultimately filed for Chapter 15 bankruptcy protection in March 2016.

**\*3**  In the wake of Abengoa's bankruptcy, various investors pursued both civil and criminal actions in Spain against Abengoa and some of its officers, directors, and subsidiaries. For example, on March 22, 2016, investors filed a criminal complaint in Spain alleging that Sanchez Ortega and Abengoa's former Executive Chairman, Felipe Benjumea Llorente ("Benjumea"), had engaged in securities fraud. The National Court in Madrid, which handles "particularly severe crimes," *id.* at 935, later granted a motion to expand the criminal complaint to include Abengoa as a defendant because there was sufficient evidence to indicate

that "some type of criminal offense" had occurred, *id.* at 937 (emphasis omitted) (internal quotation marks omitted). The National Court noted that there was evidence of "systematic concealment of substantial losses of [Abengoa's] assets" and "a visible misrepresentation of the reality of [Abengoa's] economic and financial situation," which "would result in obvious damage to those who invested, trusting in the truthfulness of the financial information provided by ABENGOA." *Id.* at 937–38 (emphases omitted) (internal quotation marks omitted). In making these observations, the National Court relied on an expert report prepared by the auditing firm Silva & Asociados; an investigation report from Spain's financial accounting regulator, the Institute of Accounting and Auditing of Accounts ("ICAC"); and a forensic report completed by two financial-consulting firms.

During the pendency of those proceedings, a confidential whistleblower referred to as "FE7," who worked within Inabensa's Controller Department, submitted a letter to the Office of the Prosecutor of the National Court in Madrid detailing widespread accounting fraud at Abengoa. According to that whistleblower, Abengoa routinely inflated its estimated profit margin for construction projects by understating the entire cost of the project. These inflated profit margins allowed Abengoa to recognize revenue prematurely over the course of its projects, with some projects being "hyper-inflated to rapidly accelerate project revenue." *Id.* at 907. As a result, Abengoa was able to "portray[ ] a more profitable and liquid appearance to the public," and members of Abengoa's management were able to more easily "meet [their] bonus objectives by increasing project earnings." *Id.* At the same time that this false financial data was being reported to the public, project managers at Abengoa maintained a separate set of books using Excel spreadsheets that recorded the *actual* costs, expenses, and margins of projects. According to FE7, this practice of keeping two sets of books was "commonplace and widely known within" the company. *Id.*

FE7 also alleged that Inabensa falsified cost provisions, which are placeholder accounting entries that denote a cost or expense that has been incurred but not yet registered for an account. Under International Accounting Standards, a company can recognize revenue on a project in proportion to the costs incurred on that project. In other words, the greater the costs incurred, the greater the revenue that the company can recognize. According to FE7, Inabensa "entered cost provisions for materials that had not yet been ordered, purchased[,] or, in fact, even needed for a particular project"

so that it could recognize revenue prematurely. *Id.* at 908. FE7 identified several specific projects where Inabensa employed this practice.

FE7's allegations were corroborated by allegations from other former Abengoa employees who observed similar fraudulent accounting practices. For example, one former Abengoa employee, "FE5," who had been assigned to Inabensa's Controller Department, described how the company engaged in a practice of triangulation whereby unrelated expenses were oftentimes transferred to new projects to "hid[e] undeclared losses from prior projects, increas[e] the percentage-of-completion of new projects[,] and recogniz[e] higher revenues for Abengoa." *Id.* at 913. According to FE5, the allocation of expenses from old projects that were losing money to current projects led to a chain reaction in which the actual expenses from current projects, which were already saddled with false costs from the older projects, were then allocated to future projects. Of course, future projects were, by definition, speculative and might never materialize, raising the likelihood that the scheme would unravel as the losses hidden from investors could no longer be "passed on" to newer projects. According to FE5, this is precisely what occurred at Abengoa, leading the company to declare bankruptcy. FE5 further alleged that the accounting fraud was orchestrated by director-level employees, who were the only individuals high enough in the company to generate the invoices needed to pull off this scheme.

**\*4** The allegations of these corporate insiders were corroborated by an internal audit commissioned by Abengoa's new president, which "concluded that accounting fraud had occurred at Abengoa ... at the direction of Abengoa's most senior management, including its former Executive Chairman Benjumea." *Id.* at 915. Specifically, the accounting firm Klynveld Peat Marwick Goerdeler ("KPMG") observed that Abengoa manipulated the revenue recognized in its financial statements by altering project margins and advancing percentages of completion on projects to inflate Inabensa's earnings.

## II. PROCEDURAL HISTORY

On August 10, 2015, Michael Francisco, an investor who owned Abengoa ADSs, commenced a putative class action in the United States District Court for the Southern District of New York against Abengoa and certain of its directors and officers, alleging violations of the Exchange Act and Rule

10b-5 based on the misrepresentations made during the July 31, 2015 conference call. The next month, another putative class action was filed in the Southern District of New York, raising substantially the same claims. The proposed class in both cases consisted of purchasers of Abengoa's ADSs between October 17, 2013 and August 3, 2015. Jesse and Arlette Sherman and the PAMCAH-UA Local 675 Pension Fund both moved to consolidate the actions and be appointed as lead plaintiffs. The district court granted the consolidation motion and appointed the Shermans as lead plaintiffs. The Shermans, along with the PAMCAH-UA Local 675 Pension Fund, filed a First Amended Complaint ("FAC") asserting claims under both the Exchange Act and the Securities Act against Abengoa, the Underwriter Defendants, and twenty-one former Abengoa executives. The FAC alleged that the Registration Statement for the October 2013 ADS offering contained false statements that "misled the market about Abengoa's liquidity and cash flow" because Abengoa had, among other things, misclassified debt and overstated its financial position. Suppl. App'x at 16. After a three-year stay during the pendency of Abengoa's bankruptcy proceedings, Plaintiffs filed a Second Amended Complaint ("SAC") that repeated many of the same allegations in the FAC but also alleged that Abengoa had made false statements in the Registration Statement because the company did not adhere to the percentage-of-completion method.

Defendants moved to dismiss the SAC, and the district court granted the motion, concluding that (1) the Securities Act claims were untimely, (2) Plaintiffs failed to state a claim under the Securities Act because they did not identify any false financial statements, and (3) Plaintiffs failed to state a claim under the Exchange Act because they neither identified any false statements nor adequately alleged scienter. The district court nevertheless granted Plaintiffs leave to file the Third Amended Complaint (the "TAC"), except as to the Exchange Act claims against Sanchez Ortega, which the court found did not support an inference of scienter and for which amendment would be futile.

Defendants ultimately moved to dismiss the TAC, and on August 31, 2022, the district court granted the motion and dismissed the TAC with prejudice. The district court once again concluded that Plaintiffs' Securities Act allegations were barred by the one-year statute of limitations and that their Exchange Act claims failed to adequately allege any false statements or the existence of corporate scienter. Plaintiffs timely appealed the dismissal of the TAC as well as

the district court's denial of leave to amend the Exchange Act claims against Sanchez Ortega.

### III. STANDARD OF REVIEW

**\*5** "We review *de novo* a district court's dismissal of a complaint for failure to state a claim." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351 (2d Cir. 2022). In doing so, "we accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 140 (2d Cir. 2023). Nevertheless, we will not credit "mere conclusory statements," "[t]hreadbare recitals of the elements of a cause of action," or "a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). In other words, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and that establishes "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### IV. DISCUSSION

#### A. Securities Act Claims

Plaintiffs asserted claims under section 11 of the Securities Act against Abengoa, the Underwriter Defendants, and Sanchez Ortega and under section 15 against Sanchez Ortega. Section 11 "prohibits materially misleading statements or omissions in registration statements filed with the SEC," while section 15 "creates liability for individuals or entities that 'control[ ] any person liable' under section 11." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (quoting 15 U.S.C. § 77*o*). The district court dismissed Plaintiffs' Securities Act claims on the grounds that they were untimely and, alternatively, that they failed to state a claim. We disagree with each conclusion.

##### 1. Timeliness

Claims brought pursuant to section 11 of the Securities Act are subject to a one-year statute of limitations, which begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made

by the exercise of reasonable diligence." 15 U.S.C. § 77m. We have explained that "[a] plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). Specifically, under the so-called "storm warnings" doctrine, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.*

The district court concluded that Abengoa's November 2014 disclosure that it had mischaracterized some of its corporate debt provided such a storm warning and triggered Plaintiffs' duty to inquire. We disagree. We have previously held that "[i]nformation triggers the duty to inquire if it *relates directly* to the misrepresentations and omissions the plaintiff alleges in its action against the defendants." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 120 (2d Cir. 2017) (emphasis added) (alterations accepted and internal quotation marks omitted). Here, Abengoa's November 2014 disclosure – in which it acknowledged that it had misclassified its debt – did not "relate directly" to Plaintiffs' allegations in the FAC and SAC that Abengoa made false statements in its Registration Statement regarding its accounting practices. Rather, the storm warning occurred on August 3, 2015, when Abengoa announced a massive capital increase and asset divestiture, which raised concerns among investors regarding Abengoa's liquidity. Because the FAC was filed within one year of *that* storm warning, Plaintiffs' section 11 claims are not barred by the one-year statute of limitations.

**\*6** Defendants alternatively argue that even if the *FAC* was timely filed, Plaintiffs' Securities Act claims in the *TAC* – the operative complaint – are untimely because they were filed outside the limitations period and do not relate back to those claims asserted in the FAC. Again, we disagree. It is true that a claim asserted in an amended complaint "is time-barred unless it relates back to the filing of the initial complaint." *ASARCO LLC v. Goodwin*, 756 F.3d 191, 202 (2d Cir. 2014). Under Federal Rule of Civil Procedure 15(c), "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim ... that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." As we have explained previously, the "central inquiry is whether adequate notice of the matters raised in

the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal quotation marks omitted). Here, Plaintiffs' claims asserted in the TAC relate back because the "facts provable under the amended complaint arose out of the conduct alleged in the original complaint." *Id.* at 227. As noted above, the FAC alleged that Abengoa "obtained lines of credit utilizing erroneous financial reports that overstated the value of certain projects, by showing inaccurate percentages of completion on some projects, and failing to show that some projects were over-budget." Suppl. App'x at 16. Plaintiffs' new claims in the TAC – *i.e.*, that representations in the Registration Statement regarding Abengoa's use of the percentage-of-completion method were false or misleading – arise out of the same conduct alleged in the FAC.

Defendants respond with the novel argument that a Securities Act claim alleging a new misstatement can *never* relate back. But that argument is unsupported by our caselaw. Defendants latch onto our statement in *Slayton* that "[w]here the amended complaint does not allege a new claim but renders prior allegations more definite and precise, relation back occurs." 460 F.3d at 228. But we have never interpreted this language to mean that an amended complaint can never relate back simply because it asserts a new claim. In *Slayton* itself, we concluded that new claims related back precisely because – as here – they "ar[o]se out of the same set of operative facts." *Id.* at 229. Moreover, we have made clear that "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Id.* at 228 (internal quotation marks omitted).

For all these reasons, we conclude that the TAC was timely filed, and the district court erred in dismissing the Securities Act claims on statute-of-limitations grounds.

*2. Failure to State a Section 11 Claim*

The district court also held, in the alternative, that even if the section 11 claims were timely filed, Plaintiffs still failed to state a claim under the Securities Act. The district court recognized, correctly, that section 11 plaintiffs must allege, among other things, that "the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Morgan Stanley*, 592 F.3d at 358–59 (internal quotation marks omitted). It then went on to conclude that (1) some of

the allegedly false statements in the Registration Statement were inactionable puffery, (2) Plaintiffs' allegations of falsity were based on confidential witness statements that were insufficiently particular and on filings in various Spanish criminal proceedings that the district court declined to accept as true; (3) the statements in the Registration Statement were not misleading because Abengoa included various disclaimers; and (4) Plaintiffs failed to adequately allege the financial impact of Abengoa's accounting fraud. We address each of these conclusions in turn.

As noted above, the Registration Statement asserted that Abengoa "enforce[d] strict financial discipline" through a "robust project management and control system." J. App'x at 942 (emphases omitted) (internal quotation marks omitted). We have previously explained that "[v]ague positive statements regarding a corporate entity's risk[-]management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021) (internal quotation marks omitted); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable puffery." (internal quotation marks omitted)). We agree with the district court that Abengoa's statements regarding its "strict financial discipline" and "robust" systems are "[v]ague positive statements" and thus "too general" for a reasonable investor to rely upon them. *Synchrony*, 988 F.3d at 170 (internal quotation marks omitted).

 **\*7** We also agree with the district court that Abengoa's representations regarding its use of the percentage-of-completion method are different. The Registration Statement provided specific details about how this method would be employed such that a reasonable investor would be justified in relying on them. *See, e.g.*, J. App'x at 942 ("[T]he percentage of completion is determined at the date of every consolidated statement of financial position based on the actual costs incurred as a percentage of total estimated costs for the entire contract." (emphasis omitted) (internal quotation marks omitted)); *id.* at 943 ("Costs incurred in the period which relate to future project activities are not included when determining the percentage of completion." (emphasis omitted) (internal quotation marks omitted)). Accordingly, Abengoa's statements regarding the percentage-of-completion method are clearly more than non-actionable puffery.

Nevertheless, the district court concluded that Plaintiffs did not adequately plead the falsity of those representations, in part because the court disregarded the allegations made by confidential witnesses. We have held that "there is no requirement that [confidential sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). We conclude that each of the confidential witnesses here readily met that standard. The TAC specifically alleged that FE1 was the director of human resources at Abeinsa from August 2010 to March 2013 who repeatedly heard from employees, including through exit interviews, about accounting fraud at the company; that FE2 was "a former Abengoa employee who had broad oversight for accounting and financial reporting at several of Abengoa's U.S. subsidiaries," J. App'x at 900; that FE3 was "a Senior Staff Accountant at Abengoa's corporate office in Chesterfield, Missouri from June 2013 through July 2014," *id.*;[1] that FE4 worked for Abengoa from 1989 until 2016, including as the " 'Chief of Critical Projects Follow-up' for Inabensa between 2013 and 2014" and in the controller department from 2015 until his retirement in March 2016, *id.*; that FE5 was a communications engineer for Inabensa from 2007 until 2017, which included an assignment to the controller department where he oversaw project budgeting from April 2015 until 2017; that FE6 worked for one of Abengoa's subcontractors, was responsible for negotiating contract terms with Abengoa, and was a key liaison between the subcontractor and Abengoa; and that FE7 "worked within Inabensa's Controller Department from at least 2013 through 2015 and was responsible for overseeing Inabensa's financial accounting and reporting," *id.* at 902. Because each of these confidential witnesses was described "with sufficient particularity to support the probability ... [they] would possess the information alleged," *Novak*, 216 F.3d at 314, we conclude that the district court erred by disregarding their allegations.

1      We recognize that the district court did "not discount the testimony of FE3" because that witness's "allegations were sufficiently specific." *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 394 n.15 (S.D.N.Y. 2022).

The district court also "decline[d] to assume the truth of the allegations in the Spanish proceedings." *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365, 397 (S.D.N.Y. 2022)

(internal quotation marks omitted). Defendants argue that Plaintiffs may not plead facts based on reports and allegations from the Spanish criminal proceedings. Defendants primarily rely on *Lipsky v. Commonwealth United Corp.*, in which we held that "neither a complaint nor references to a complaint which results in a consent judgment may be properly cited in the pleadings." 551 F.2d 887, 893 (2d Cir. 1976). But we explicitly limited our holding in *Lipsky* to the facts of that case because the consent judgment was merely "the result of private bargaining" and did not reflect "an actual adjudication of any of the issues." *Id.* at 893–94. Outside of this context, we certainly did not foreclose plaintiffs from relying on facts and allegations incorporated in another proceeding.

**\*8** We subsequently had the opportunity to elaborate upon our holding in *Lipsky* in the context of a securities-fraud complaint that relied on allegations in an SEC order. While we recognized that "a complaint that *merely* recites others' allegations may ... be insufficient," we explained that the plaintiffs "also allege[d] non-conclusory facts and ... these additional factual pleadings [we]re sufficient to render unproblematic any implied reliance on the SEC findings." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015). We further noted that Plaintiffs' "allegations – albeit clearly overlapping with the SEC order – [were] made directly by Plaintiffs, ... were signed by Plaintiffs' counsel subject to the requirements of [Federal Rule of Civil Procedure] 11," and "[t]aken together" were "adequate to survive a motion to dismiss."*Id.* Applying our holdings in *Lipsky* and later *Loreley*, district courts within this Circuit have regularly permitted plaintiffs to incorporate allegations made in other complaints or proceedings. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("[T]he weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because neither Circuit precedent nor logic supports ... an absolute rule against doing so." (internal quotation marks omitted)); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) ("It makes little sense to say that information from ... a study – which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint."); *Sec. & Exch. Comm'n v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010) ("There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings[.]").

For the avoidance of all doubt, we hold that a complaint may rely on factual allegations or reports incorporated in complaints from other proceedings, subject, of course, to the limitations of Federal Rule of Civil Procedure 11. In other words, the attorney signing the complaint must still be able to "certif[y] that to the best of [the attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] ... the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). While this is inherently a case-dependent inquiry that will turn on the nature of the allegations contained in the other proceeding, we note that the allegations relied on by Plaintiffs in the TAC here were detailed, independently corroborated, and the product of an independent investigation. *See, e.g.*, *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (permitting plaintiffs "to borrow allegations from the [New York Attorney General's (the 'NYAG')] complaint" because "[t]he facts [were] derived from a credible complaint based on facts obtained after an investigation" and "counsel for plaintiffs have indicated that they have reached out to attorneys at the NYAG to verify the allegations in the [c]omplaint"); *Bear Stearns*, 851 F. Supp. 2d at 768 n.24 ("Not all complaints are created equal – while some barely satisfy the pleading requirement, others are replete with detailed factual information of obvious relevance to the case at hand."). These features distinguish the TAC from our prior precedents in which we rejected pleadings that merely relied on conclusory allegations asserted in other proceedings. *See Loreley*, 797 F.3d at 180.

For example, the Spanish National Court ruling did not merely consist of conclusory assertions but rather was based on an auditing firm's expert report, ICAC's resolution of its investigation, and a forensic report from two financial-consulting firms, each of which "the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony." *Bear Stearns*, 851 F. Supp. 2d at 768 n.24. Similarly, the statements made by FE4, FE5, and FE7 in the Seville criminal proceeding were not merely conclusory allegations but rather consisted of detailed observations regarding the accounting-fraud scheme at Abengoa. Moreover, the allegations of all three confidential witnesses were independently corroborated by the allegations of other confidential witnesses, the aforementioned reports, and the KPMG investigation. And while it is true that plaintiffs ultimately may not be able to prove those allegations at a later stage of the proceedings, it is not for the district court

to presume as much on a motion to dismiss. Accordingly, we conclude that the district court erred in disregarding the allegations from the Spanish criminal proceedings at this stage.

**\*9** Upon consideration of those allegations, we are persuaded that Plaintiffs have plausibly alleged that Abengoa's representations in the Registration Statement regarding its use of the percentage-of-completion method were false. As described above, Plaintiffs alleged that Abengoa engaged in three primary forms of accounting fraud. *First*, the company fraudulently inflated profit margins by not accounting for the entire cost of the project, thereby allowing Abengoa to "recognize revenue prematurely throughout the life of a project." J. App'x at 906. In at least one instance – according to FE7 – the profit margin was "hyper-inflated," which allowed Inabensa to recognize "the total estimated profit for the entire project when, in reality, the project had hardly even started." *Id.* at 907 (internal quotation marks omitted); *see also id.* at 911 (alleging that FE4 "confirmed that in 2013 and 2014, Inabensa routinely recognized expenses prematurely in new projects in order to record inflated project revenues"). This practice of inflating profit margins was supported by the findings of KPMG's internal audit and by the resolution from ICAC – Spain's top financial accounting regulator – which found an "absolute lack of justification" for the profit margins that Abengoa reported. *Id.* at 941 (internal quotation marks omitted).

*Second*, Abengoa "falsified costs to accelerate the recognition of revenue on certain projects." *Id.* at 907. FE3 reported "manually modifying various accounting entries," including "adjusting cost provisions at the direction of senior management," in order to "maintain or create an appearance of profitability on certain projects." *Id.* at 910. Likewise, FE4 recounted that in several instances, cost provisions "were entered immediately" despite the purchase orders not having been issued, or the supplier even identified, for those projects. *Id.* at 912; *see also id.* at 910–11 (recounting FE4's allegations that projects "contained inaccurate cost provisions information," which led to "inaccurate income data"). FE5 similarly detailed how he "was instructed to manipulate costs" in order to maintain a consistent profit margin throughout the duration of the AVE Mecca Medina project. *Id.* at 919. And FE6 described how project managers at Abengoa asked one of its subcontractors "for letters confirming the purchase of materials and supplies ... even though those materials and supplies were not yet or ever needed," thus enabling Abengoa to prematurely recognize revenue. *Id.* at 914.

*Third*, Abengoa engaged in a practice of triangulation whereby costs from current projects were assigned to new projects in order to hide undeclared losses on the former, increase the percentage-of-completion on the new projects, and recognize higher revenues for the company. For example, FE5 discovered that unrelated expenses had been charged to Abengoa's AVE Mecca Medina project, totaling over €22 million. The KPMG audit also found that Inabensa Turkey engaged in this practice of invoice triangulation, which enabled Inabensa to inflate its earnings to "double what Abengoa had initially forecasted." *Id.* at 916. The audit further uncovered that this triangulation practice was directed by high-level Abengoa executives, including its former Executive Chairman, Benjumea. In light of all these allegations, Plaintiffs adequately pleaded the falsity of Abengoa's representations that it followed the percentage-of-completion method.

The district court alternatively concluded that, notwithstanding the factual allegations contained in the TAC, the Registration Statement's representations concerning the percentage-of-completion method were not misleading by virtue of the "cautionary language" contained therein. *Francisco*, 624 F. Supp. 3d at 397. Again, we disagree. We have explained that, under the "bespeaks caution doctrine," "alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (alteration accepted and internal quotation marks omitted). When a registration statement contains cautionary language, we look to "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Id.* (internal quotation marks omitted).

**\*10** The Registration Statement here included cautionary language explaining that the percentage-of-completion method relied on "the use of estimates." J. App'x at 942 (internal quotation marks omitted). But it strains credulity to suggest that such a tepid warning about the use of estimates was enough to put investors on notice that Abengoa was deliberately manipulating the percentage of completion to inflate its revenues. Thus, even with the disclaimer, a reasonable investor would have been misled by Abengoa's statements. *See Rombach*, 355 F.3d at 173 ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there

might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." (internal quotation marks omitted)).

The district court also held that the TAC failed to state a claim because it did not adequately plead "the impact of the alleged triangulation scheme on the financial statements as a whole," therefore calling into question the materiality of Abengoa's alleged misrepresentations. *Francisco*, 624 F. Supp. 3d at 397. But accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of Plaintiffs – as we must – we reach a different conclusion. Plaintiffs alleged, based on the statements of FE1, FE4, FE5, and FE7, that the triangulation practice was "widespread and systemic within Abengoa, and not just limited to the two [specific] projects mentioned." J. App'x at 921–22; *see id.* at 911–14. The KPMG report likewise concluded that the triangulation practice was directed by Abengoa's senior management, further supporting the inference that the practice was widespread throughout the company. Additionally, Plaintiffs alleged – based on FE5's testimony – that the triangulation practice "precipitated Abengoa's collapse and led it to bankruptcy." *Id.* at 913. Taking these allegations as true, we conclude that Plaintiffs adequately alleged the impact of the triangulation scheme on the company as a whole. We further note that the materiality of an alleged misrepresentation "will rarely be dispositive in a motion to dismiss" because "[a] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (alterations accepted and internal quotation marks omitted). That high bar has not been met here. [2]

2    Defendants also contend that Plaintiffs were required to plead scienter for their section 11 claims. But Defendants did not raise this argument before the district court in their motions to dismiss, and it "is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (internal quotation marks omitted). "[W]e will generally not exercise our discretion where the forfeited argument was available to the parties below and they proffer no reason for their failure to raise the arguments below." *Siemens Energy, Inc. v. Petróleos de Venez., S.A.*, 82 F.4th 144, 160 (2d Cir.

2023) (alterations accepted and internal quotation marks omitted). Because Defendants could have raised this argument below and have not explained their failure to do so, we will not consider it for the first time on appeal.

For all the foregoing reasons, we conclude that Plaintiffs have stated a section 11 claim and reverse the judgment of the district court in this respect.

*3. Failure to State a Section 15 Claim Against Sanchez Ortega*

Plaintiffs also asserted a claim against Sanchez Ortega under section 15 of the Securities Act, which "creates liability for individuals or entities that control any person liable under section 11." *Morgan Stanley*, 592 F.3d at 358 (alteration accepted and internal quotation marks omitted). The district court dismissed Plaintiffs' section 15 claim because "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under section[ ] 11," *id.*, and the court had found that Plaintiffs failed to state a section 11 claim. Because we reverse the district court's section 11 holding, we vacate the section 15 dismissal and remand for further proceedings consistent with this Opinion.

**B. Exchange Act Claims**

**\*11** In addition to the above claims under the Securities Act, Plaintiffs asserted claims against Abengoa and Sanchez Ortega under section 10(b) of the Exchange Act and SEC Rule 10b-5 and against Sanchez Ortega under section 20(a) of the Exchange Act. Section 10(b) prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Rule 10b-5 makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. And section 20(a) creates a cause of action against any person "who, directly or indirectly, controls any person liable" under the Exchange Act and associated regulations. 15 U.S.C. § 78t(a).

*1. Failure to State a Claim Against Abengoa*

The district court dismissed Plaintiffs' Exchange Act claims against Abengoa on the ground that Plaintiffs had failed to adequately allege the existence of an underlying accounting fraud scheme. But as we concluded above, Plaintiffs adequately alleged such a scheme, so this rationale no longer

holds. The district court also determined, in the alternative, that Plaintiffs failed to adequately plead scienter, which is an element of an Exchange Act claim. But this analysis was premised, in large part, on the district court's decision to disregard allegations from the confidential witnesses and Spanish criminal proceedings, which, as discussed above, was error.

Those materials are replete with allegations that high-level Abengoa executives sought to intentionally misrepresent the company's financial position to obscure the company's losses and to maximize their own bonuses. For example, FE1 recounted that when Abeinsa's internal auditor challenged financial reports that inflated the value of certain projects, Abeinsa's Chief Financial Officer instructed that auditor to "shut ... up and just sign" the reports. J. App'x at 920 (internal quotation marks omitted). Likewise, the KPMG report revealed that Abengoa's executive chairman – Benjumea – along with other Abengoa executives, including the Director of Inabensa's Administration Department and Abengoa's General Secretary, orchestrated a fraudulent scheme to hide financial losses and inflate earnings by triangulating invoices between projects. In light of the district court's failure to consider these and other allegations, we vacate the dismissal of the Exchange Act claims against Abengoa and remand for further proceedings consistent with this Opinion.

### 2. Denial of Leave to Amend Exchange Act Claims Against Sanchez Ortega

The district court previously denied Plaintiffs leave to amend their Exchange Act claims against Sanchez Ortega because such amendments would be futile in alleging his scienter. "We review a district court's denial of leave to amend for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224 (2d Cir. 2017) (internal quotation marks omitted). We have explained that an amendment is futile if it "would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." *Id.* at 225 (internal quotation marks omitted). The district court concluded that the proposed amendments to Plaintiffs' complaint would be futile because they still did not adequately allege Sanchez Ortega's scienter. Under the Private Securities Litigation Reform Act, a complaint asserting Exchange Act claims must "state with particularity facts giving rise to a *strong* inference that the defendant acted

with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

**\*12** Plaintiffs argue that the timing of Sanchez Ortega's retirement is sufficient to support such a strong inference of scienter. We disagree. Even though "[w]e have suggested that employees' 'suspicious' resignations may be suggestive of scienter," "we have done so only in the context of other compelling circumstantial allegations supporting scienter." *KBC Asset Mgmt. NV v. MetLife, Inc.*, No. 21-291, 2022 WL 480213, at \*3 (2d Cir. Feb. 17, 2022) (quoting *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021)); *see also, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) ("[A] resignation can establish scienter only if the plaintiff alleges independent evidence corroborating that the employee who resigned held a culpable state of mind. Standing alone, however, an employee's resignation does not raise a strong inference of scienter." (citation omitted)). Here, the TAC is bereft of such compelling circumstantial allegations. The mere fact that Sanchez Ortega resigned around the same time that Abengoa needed to borrow from its majority shareholder and approximately six months before the company filed for creditor protection is insufficient to support a *strong* inference of scienter. In their reply brief, Plaintiffs make much of the fact that Sanchez Ortega subsequently took a position at a demanding investment-management firm despite claiming that he was retiring to lead a quieter life. But these allegations appear nowhere in the TAC, and "the law is clear that a party may not amend pleadings through a brief." *Gamma Traders – I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) (internal quotation marks omitted). Accordingly, we conclude that the district court did not err in denying Plaintiffs leave to file the portion of the TAC asserting Exchange Act claims against Sanchez Ortega.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **VACATE** in part the judgment of the district court.

**All Citations**

--- F.4th ----, 2025 WL 2825369

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.